UNITED STATES of America, Plaintiff,

v.

WEST COAST NEWS COMPANY, Inc., a California corporation, Sanford E. Aday and Wallace De Ortega Maxey, Defendants.

Crim. No. 6615.

United States District Court
W. D. Michigan, S. D.

April 19, 1963.

George E. Hill, Dist. Atty., Robert G. Quinn, Jr., Asst. Dist. Atty., Grand Rapids, Mich., Marshall Tamor Golding, Crim. Div., Dept. of Justice, Washington, D. C., for plaintiff.

Stanley Fleishman, Hollywood, Cal., Richard F. VanderVeen and George R. Cook, Grand Rapids, Mich., for defendants.

FOX, District Judge.

This case, in which the United States, by a Grand Jury Indictment, charged the defendants in nineteen counts with violating Title 18 U.S.C. §§ 1461 and 1462, using the mails and a common carrier for delivery of obscene books, is challenged by defendants through six motions.[1]

The indictment was found in the district of alleged distribution and delivery of the books, Title 18 U.S.C. § 3237(a).

The United States filed a motion to strike defendants' motion to dismiss the indictment because of the alleged invalidity of the Grand Jury, March 12, 1963. The Government's motion is based on the issue of timeliness of challenges to the

---

1. The particular motions are categorically as follows:

 (1) Defendants' motion in pursuance to Federal Rules of Criminal Procedure, Rule 21(b), for transfer of this proceeding from this district to the Southern District of California, which was filed August 15, 1960.

 (2) Defendants' motion to dismiss the indictment because of the alleged in-

array and the indictment. Agnew v. United States, 165 U.S. 36, 17 S.Ct. 235, 41 L.Ed. 624.

Briefs were filed on all motions, excepting the Government's motion to strike.

Arguments on all motions were presented to the court through most of March 13, 1963. Testimony in support of defendants' position challenging the Grand Jury was presented through the balance of the 13th, and on the 14th and 15th of March. Testimony was taken subject to the court's reservation concerning the effect of the Agnew case, supra, and in order to accommodate defendants' attorney, Mr. Fleishman, who had traveled in from California to present defendants' position.

1. MOTION TO TRANSFER.

Senior Judge Raymond W. Starr, then chief judge, filed an opinion and denied the first motion to transfer the case to the Southern District of California, on February 13, 1962, D.C., 30 F.R.D. 13.

2. MOTION TO DISMISS THE INDICTMENT BECAUSE OF THE ALLEGED INVALIDITY OF THE GRAND JURY.

3. MOTION TO DISMISS INDICTMENT.

At a proceeding before Judge Raymond W. Starr, at Grand Rapids, Michigan, on August 15, 1960, George R. Cook, an attorney from Grand Rapids, and Stanley Fleishman, an attorney from Hollywood, California, appeared on behalf of the defendants.

Richard F. VanderVeen and George R. Cook filed formal appearance for the defendants on August 18, 1960.

At the August 15, 1960 proceeding, the court directed that if the Government or the defendants intended to file any further motions in this action, they should be filed and served on or before September 30, 1960.

The Grand Jury which returned an indictment in this case was impaneled on September 16, 1959, and the indictment was returned May 24, 1960.

During pendency of proceedings before the Grand Jury. Mr. Stanley Fleishman, one of the attorneys for the defendants, requested that he be allowed to appear before the Grand Jury to argue defendants' innocence and the constitutionally protected nature of the books in question. The District Attorney permitted Mr. Fleishman to send a letter to the Grand Jury, then in session, stating why, in his opinion, no indictment should be returned in this case.

Mr. Fleishman sent Grand Jury Exhibit No. 39, a letter dated April 19, 1960, addressed to the foreman of the Grand Jury and to the Grand Jury, together with a copy of a letter from the firm of Brock, Fleishman and Rykoff, dated December 18, 1958, signed by Mr. Fleishman. This latter letter was an opinion of Mr. Fleishman to Saber Books and Fabian Books, 2919 Belmont Avenue, Fresno, California, in which he advised that certain named books were constitutionally protected expressions, and as such, freely distributable.

Mr. Fleishman quoted extensively from Chief Judge Yankwich's opinion in a Southern District of California case, which involved an obscenity question. This, Mr. Fleishman told the Grand Jury, was a reasonably fair statement of the law on the question of obscenity.

■ Thus, the defendants were well aware, over a month before return of the indictment, of the exact nature and

validity of the Grand Jury, filed on March 30, 1962.

(3) Defendants' motion to dismiss the indictment because it is an unconstitutional application of the statutory law controlling use of the mails, filed March 30, 1962.

(4) Defendants' motion for a bill of particulars, also filed on March 30, 1962.

(5) Defendants' motion for renewal and reargument of the motion to transfer pursuant to Rule 21(b), filed December 3, 1962.

(6) Defendants' motion to reduce the bond, filed March 1, 1963.

extent of the charges which the Grand Jury was considering.

At that time the same factual information upon which defendants predicated the challenge to the array was "open and available" to them, as well as it was on March 27, 1962.

Later, in oral arguments before the court on August 15, 1960, Mr. Fleishman said:

"I am sure, that all things considered, we would get *a fair trial* here, except for the fact we are so far from home, we are so far from everything that makes *a fair trial* possible, in the sense that the constitution talks about having *a trial* in your home, where you have your friends, where you have the witnesses, where you have the parties, to defend it.

"Your Honor, it takes three days, three days for me to argue this motion. I traveled all day yesterday; I am here today; and I won't get home until Tuesday, to make a motion for change of venue at great expense and great personal inconvenience.

"There is no need for that, your Honor. It is harsh; it is oppressive. The government has served its function. *The grand jury has returned an indictment. We are not asking this court to quash that indictment. All we say,* your Honor, *is let us have the trial in a place where we have a fair opportunity to defend ourselves.*" (Tr. 33–34) (Emphasis supplied.)

Defendants' first motion in this case was to transfer the action to the Southern District of California. Had the transfer been granted, surely the challenge of an allegedly unlawfully convened Grand Jury and other claimed Grand Jury irregularities would never have been made.

On February 13, 1962, Judge Starr filed his opinion denying defendants' motion to transfer the action to California.

The defendants were arraigned on March 2, 1962.[2] At that time, the following conversation took place:

"Mr. Quinn: (Assistant District Attorney) If the court please, the government at this time would also ask the court to entertain an oral motion requesting that a time limit be established by the court for the filing of all pretrial motions in this case * * *

"The Court: In order that this case may move along toward trial, the court orders and directs that any and all motions which each or any or all of the defendants desire to file in this criminal action shall be filed in this court within thirty days from this date. Is that plain?

"Mr. Cook: (Attorney for defendants) Very plain, your Honor."

The motion was directed to all pretrial motions and not to all pre-arraignment motions. Motions to the competency of the Grand Jury or to the sufficiency of the indictment or information, are pre-arraignment motions. Federal Rules of Criminal Procedure, Rule 12(b) (3).

Defendants delayed filing the motion to dismiss the indictment on their challenge to the array until March 27, 1962, one year, ten months and three days after the return of the indictment against them, and one year, eleven months and eight days after defendants' counsel, Mr. Fleishman's specially privileged letter to the Grand Jury.

In the case of Agnew v. United States, 165 U.S. 36, 44, 17 S.Ct. 235, 238, 41 L.Ed. 624, 627, Chief Justice Fuller delivered the opinion of the United States Supreme Court, and said:

"Dr. Wharton lays it down (Whart.Cr.Pl. & Pr. §§ 344, 350) that 'material irregularities in selecting and impaneling the grand jury, which do not relate to the competency of individual jurors, may usually be objected to by challenge to the array, or by motion to

---

**2.** One of the original defendants, Mr. Mathew Meehan, had died before arraignment.

quash,' or by plea and abatement; that the question of the mode in which such objections are to be taken largely depends upon local statutes, *but that certain rules may be regarded generally applicable. One of these rules is that the defendant must take the first opportunity in his power to make the objections. Where he is notified that his case is to be brought before the grand jury, he should proceed at once to take exception to its competency, for if he lies by until a bill is found, the exception may be too late*; but where he has had no opportunity of objecting before bill found, then he may take advantage of the objection by motion to quash or by plea and abatement, the latter in all cases of contested fact being the proper remedy.

"United States v. Gale, 109 U.S. 65 [3 S.Ct. 1 (27 L.Ed. 857)]. Another general rule is that for such irregularities as do not prejudice the defendant, he has no cause of complaint, and can take no exception. U. S. v. Richardson [1st Cir.], 28 Fed.Rep. 61 [65]; United States v. Reed, 2 Blatchford, 435, [456] [Fed.Cas.No.16,134); United States v. Tallman, 10 Blatchford, 21, 51 [Fed.Cas.No.16,429]; State v. Mellor, 13 R.I. 666; Cox v. People, 80 N.Y. 500; People v. Petrea, 92 N.Y. 128.

"The original venire was issued November 18, the second venire issued December 2, 1895. The court opened December 3, 1895, and the indictment was returned December 12, yet defendant did not file his plea in abatement until December 17."[3]

"*The plea does not allege want of knowledge of threatened prosecution on the part of the defendant, nor want of opportunity to present his objection earlier*, nor assign any ground why exception was not taken or objection made before; and, moreover, the plea is fatally defective in that, although it is stated that the drawing 'tended to his injury and prejudice,' no grounds whatever are assigned for such a conclusion, nor does the record exhibit any such." (Emphasis supplied.)

Defendants' motion in this case is without either plea or evidence that they had no opportunity to object before the bill was found, and certainly they cannot plead lack of knowledge of threatened prosecution.

In Cook v. United States, 4 F.2d 517 (CCA, 5th 1925), Circuit Judge Walker said at Page 518:

"*For ought that was made to appear he had abundant opportunity to object to the competency of the grand jury before the indictment was found, and certainly much sooner than he did so after the indictment was returned.* No explanation or reason for the delay was disclosed. Such an objection to a grand jury cannot properly prevail, *unless it is made promptly after an opportunity to make it is presented.*

"Agnew v. United States, 165 U.S. 36, 17 S.Ct. 235, 41 L.Ed. 624; Wolfson v. United States, 101 F. 430, 41 C.C.A. 422; Powe v. United States, 2 F.(2d) 975 (U. S. Circuit Court of Appeals, Fifth Circuit, present term).

"The overruling of the motion to quash the indictment was justified, because the *objections made to the competency of the grand jury came too late, whether they could or could not properly have prevailed, if they had been made with due promptness.*" (Emphasis supplied.)

Clearly, defendants in this present case in fact had "abundant opportunity to object to the competency of the Grand Jury before the indictment was found, and

---

3. Defendants' challenge in Agnew was fourteen days after opening of court, five days after return of the indictment.

certainly much sooner than [they] did after the indictment was returned".

Neither Rule 6 nor Rule 12 of the Federal Rules of Criminal Procedure [4] changes the intent and purpose of the rule of the Agnew case, excepting, however, the rules do give the court the power for *good cause shown,* to grant relief from a waiver.

In this Sixth Judicial Circuit, Poliafico v. United States, 237 F.2d 97 (CCA, 6th, 1956), the principles presently applied were recognized. While the defendants in that case challenged the Grand Jury for the first time during the impaneling of the petit jury, the notorious facts of this case make the Circuit Court's ruling precisely applicable.

"In keeping with the provisions of Rule 12 of the Federal Rules of Criminal Procedure, *a motion challenging the method of impanelling a grand jury must be made before the plea is entered except in instances where the court permits it to be made within a 'reasonable' time thereafter.* Failure to raise the objection within the prescribed time constitutes a waiver. See Notes of Advisory Committee on Rules, Federal Rules of Criminal Procedure, rule 12 note, 18 U.S.C.A. Agnew v. United States, 165 U.S. 36, 17 S.Ct. 235, 41 L.Ed. 624; Wright v. United States, 8 Cir., 165 F.2d 405, 407; Carruthers v. Reed, 8 Cir., 102 F.2d 933, 939." At page 110. (Emphasis supplied.)

 Nor can an extension be concluded from the general language of Judge Starr on Pages 3 and 10 of the transcript of the arraignment on March 2, 1962. The nature of the challenge to competency of the Grand Jury is such that it must be specifically reserved and good cause must be shown why the motion was not raised before the arraignment. Poliafico v. United States, supra.

At all times before and since the August 15, 1960 hearing, defense counsel remained conspicuously silent on the subject of alleged incompetency of the Grand Jury, as well as any intentions to challenge the Grand Jury array, or its indictment. Therefore, under the Federal Rules of Criminal Procedure, defendants

---

4. Rule 6(b) "Objections to Grand Jury and to Grand Jurors.
 "(1) Challenges. The attorney for the government or a defendant who has been held to answer in the district court may challenge the array of jurors on the ground that the grand jury was not selected, drawn or summoned in accordance with law, and may challenge an individual juror on the ground that the juror is not legally qualified. Challenges shall be made before the administration of the oath to the jurors and shall be tried by the court.
 "(2) Motion to Dismiss. A motion to dismiss the indictment may be based on objections to the array or on the lack of legal qualification of an individual juror, if not previously determined upon challenge. An indictment shall not be dismissed on the ground that one or more members of the grand jury were not legally qualified if it appears from the record kept pursuant to subdivision (c) of this rule that 12 or more jurors, after deducting the number not legally qualified, concurred in finding the indictment."
Rule 12(b). "The Motion Raising Defenses and Objections.

 "(1) Defenses and Objections Which May be Raised. Any defense or objection which is capable of determination without the trial of the general issue may be raised before trial by motion.
 "(2) Defenses and Objections Which Must be Raised. Defenses and objections based on defects in the institution of the prosecution or in the indictment or information other than that it fails to show jurisdiction in the court or to charge an offense may be raised only by motion before trial. The motion shall include all such defenses and objections then available to the defendant. Failure to present any such defense or objection as herein provided constitutes a waiver thereof, but the court for cause shown may grant relief from the waiver. Lack of jurisdiction or the failure of the indictment or information to charge an offense shall be noticed by the court at any time during the pendency of the proceeding.
 "(3) Time of Making Motion. The motion shall be made before the plea is entered, but the court may permit it to be made within a reasonable time thereafter."

have waived their challenge. 12(b) (1), (2) and (3); Poliafico v. United States, supra.

■ In addition, on August 15, 1960, over four months after defense counsel, Mr. Fleishman, addressed a letter to the Grand Jury, and nearly three months after the Grand Jury returned its true bill, Mr. Fleishman said: "We are not asking this court to quash that indictment".

This statement, standing alone, is sufficient to constitute an express waiver.

■ Also, defendants' motion to transfer the case to the Southern District of California constitutes an implied waiver to any challenge to the array or the indictment.

The very nature of a motion to transfer is to place the case in a posture for trial. Defendants wanted the case transferred to a jurisdiction where they could have *a fair trial,* that is, dispose of the case by plea or on its merits.

The whole thrust of the motion to transfer is that the indictment is good and defendants are ready to proceed to trial. (See oral arguments, August 15, 1960.)

The implied waiver is again re-emphasized by the motion to reargue the motion to transfer.

■ The defendants here waited until they received an adverse decision on their motion to transfer before making any application to the court to dismiss the indictment on the grounds of challenging the array, or on general grounds.

As the Fifth Circuit stated in Wolfson v. United States, 101 F. 430, 432 (CCA, 5th 1900), cert. denied 180 U.S. 637, 21 S.Ct. 919, 45 L.Ed. 710:

"A defendant under bond, whose case is to be examined by the grand jury, should, if opportunity is presented, make his objections to the grand jury before it passes on his case. He should not be permitted, *knowing that his case is to be presented to the grand jury, and having an opportunity to object to its com-*

*petency, to wait, and take chances,* and then object to it after an indictment is found." (Emphasis supplied.)

When the defendants awaited the ruling on the transfer motion, they "took their chances". It follows that they have deliberately waived the right to object to the array.

The Agnew rule is a vital proposition of law, stated and restated in a long line of cases.

For example, in Wagner v. United States, 67 F.2d 656, 657, 658 (CCA, 9th), defendants filed a plea in abatement which alleged that the grand jury which found the indictments was not drawn in accordance with law. Judge Sawtelle said:

"*Examining the plea in abatement in the instant case, we find that it makes no reference whatsoever to the appellant's want of knowledge of threatened prosecution, nor want of opportunity to present his objection earlier, nor assign any ground why exception was not taken or objection made before.*

\* \* \* \* \* \*

"Such a plea must be pleaded with strict exactness."

The court then proceeded to quote extensively from the Agnew case, supra. The court then added:

"The Agnew case has been repeatedly approved in later decisions of the Supreme Court, and has been followed by this and other Circuit Courts of Appeals.

"In Olmstead v. United States, [9 Cir.] 19 F.(2d) 842, 845, 53 A. L.R. 1472, affirmed 277 U.S. 438, 48 [S.Ct.] L.Ed. 564, 72 L.Ed. 944, 66 A.L.R. 376, the late Judge Gilbert, of this court, said: '*And it is uniformly held that a plea in abatement to an indictment, being a dilatory plea and not favored in law, must be pleaded with strict exactness and with certainty,* accuracy, and completeness, and must set forth facts, and not conclusions of law, nor evi-

dence of facts, *and that every infer-ence must be against the pleader.* (Emphasis supplied.)

\* \* \* \* \* \*

*"We are deciding the case solely upon the theory that the appellants have failed to negative, in their proof as well as in their pleading, prior knowledge of the indictment and opportunity to have objected to the method or legality of organizing the grand jury, or opportunity to have filed their pleas in abatement at an earlier time;* and, further, upon the theory that they have neither properly pleaded nor proved 'injury' or 'prejudice' resulting to them from being indicted by the grand jury as constituted in this case." (Emphasis supplied.)

■ At no time did defendants ask for time to file a specific motion challenging the array. Since the court may grant additional time for the purpose of filing a motion to challenge the array upon good cause shown, a general request to file motions without specific reference to a challenge to the array or to an indictment and the showing of good cause is insufficient to preserve a challenge to the array or the indictment.

■ The fact that the court granted permission to present testimony and arguments concerning competency of the grand jury indictment does not constitute a waiver by the court.

All this was specifically taken subject to the objection of the Government; and, also, to give the court an opportunity to re-examine and reconsider the effect and force of Agnew.

Nor may it be interpreted as a grant of permission to belatedly file the questioned motions.

The court permitted full discussion of all motions and the presentation of all testimony as an accommodation to Mr. Fleishman, because of the distance he had traveled (see transcript, August 15, 1960, page 33), and so that in the event the court concluded otherwise than it has in this opinion, it would be unnecessary for Mr. Fleishman to return to this District.

At a conference before oral arguments on all motions, the court's position was made clear on the record. (See transcript, March 13, 1963, Pages 2–13.)

In Miranda v. United States, 255 F.2d 9, 16 (CCA, 1st, 1958), Judge Maris wrote:

"The defendant also contends that the indictment against him was defective \* \* \*. His contention \* \* \* was raised after trial in his motion in arrest of judgment. The district court correctly refused to admit evidence in regard to this matter on the ground that the defendant's challenge to the panel came too late. *For it is well settled that an objection to the array or panel is required to be presented at the early stages of the proceeding,* Agnew v. United States \* \* \* (and other cases); Fed.Rules Crim.Proc. rules 6(b) and 12, *otherwise, it is considered waived."* Omitting cases cited. (Emphasis supplied.)

While U. S. v. Gilboy, 162 F.Supp. 384, 389–391 (D.C.N.D.Pa., 1958) concerned an attempt to disqualify the trial judge yet its reasoning and reference is related to Agnew. After setting out the statute concerning disqualification, 28 U.S.C. § 144, the court said:

"The indictment was returned and the arrest made in the October 1956 term; the arraignment and the defendant's motions seeking affirmative relief and arguments thereon in the March 1957 term; the opinion and orders denying defendant's motions during the October 1957 term. It was not until after defendant failed to obtain favorable rulings on his motions, to receive special treatment or a 'sign of recognition' at the arraignment that he decided to file the affidavit and certificate seeking disqualification based upon matters which allegedly had occurred and were known to the defendant some years before the re-

turn of the indictment. No cause was shown for the delay."

Quoting another case, the court continued:

" 'The statute, by its express terms, requires diligence in filing * * * and does not permit a litigant, after he has knowledge of the alleged bias or prejudice * * * without notice, to go forward in the cause before filing such affidavit after the facts of disqualification are known to him.' * * *

" 'Any well functioning system * * * should * * * require immediate challenge to the eligibility of the judge as soon as the facts leading to apprehension of bias become known; strict compliance upon waiver in the absence of such protest is necessary to prevent *last minute "discovery" of bias * * *.' * * * and see and cf. Agnew v. United States '* * * defendant must take the first opportunity in his power to make the objection.'*

"' * * * the circumstances were such as to justify belief that the affidavit was purposely held back, and its use on the eve of trial resorted to for the purpose of securing a postponement.' Shea v. United States, supra, [6 Cir.] 251 F. [433] at page 435.

*"Timeliness is a matter of substance and not merely one of form,* United States v. Parker, supra, [D. C.] 23 F.Supp. [880] at page 885; United States v. 16,000 Acres of Land, etc., supra, [D.C.] 49 F.Supp. [645] at page 656. *The privilege is waived by failure to use due diligence.* (Omitting cases cited.)

" 'Thus construed, the statute affords a party full opportunity to prevent the trial of his case by a judge against whom he can state under oath facts showing bias or prejudice. At the same time it affords to the other party and to the public protection against unnecessary surprise, delay, and expense * * *.' Chafin

v. United States, supra, [4 Cir.] 5 F.2d [592] at page 595." (Emphasis supplied.)

Thus, by every conceivable norm of judgment, both motions challenging the grand jury's competency and the indictment are untimely. An examination of the proceedings as a whole, to this point, clearly impresses these motions with a badge of studied dilatory tactics.

As late as January 14, 1963, in the case of Shotwell Mfg. Co. v. United States, 287 F.2d 667, (CCA, 7th, 1961) affirmed 371 U.S. 341, 83 S.Ct. 448, 9 L.Ed. 357, the Supreme Court had occasion to consider the effect of the Agnew rule as expressed in Federal Rules of Criminal Procedure, Rule 12(b) (2).

In that case defendants sought to attack the array four years after the trial. Citing Rule 12(b) (2), the Supreme Court said:

"We think, as the two lower courts did, that petitioners have lost these objections by years of inaction.

* * * * * *

"In the circumstances of this case, petitioners' contentions are without foundation. In denying the motions the District Court found that *the facts concerning the selection of the grand and petit juries were notorious and available to petitioners in the exercise of due diligence before the trial.* The same method of selecting jurors in the district had been followed by the clerk and the jury commissioner for years. Inquiry as to the system employed could have been made at any time. * * * And Ballard lends no support to petitioners' position, for in that case the challenge to the jury panel had been timely made and preserved. See [Ballard v. United States] 329 U.S. [187] at 190 [67 S.Ct. 261, at 262, 91 L.Ed. 181]" At pages 362–363, 83 S.Ct. at page 461. (Emphasis supplied.)

Thus, in the instant case, the facts upon which defendants rest their motions challenging the array were "notorious

and available" to them "in the exercise of due diligence" on April 19, 1960, and before, as well as on March 27, 1962.

The government's motion to strike is granted.

For purposes of thoroughness, the court feels it proper to here state in its opinion that the attack on the array, on its merits, is not well taken. United States v. Dennis, 2 Cir., 183 F.2d 201, affirmed 341 U.S. 494, 71 S.Ct. 857, 95 L. Ed. 1137; Thiel v. Southern Pacific Company, 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181; Ballard v. United States, 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181; Poliafico v. United States, supra; and I find as a matter of fact that the defendants have failed to meet their burden of proof.

The court also holds that the statement by Mr. Fleishman on August 15, 1960, constituted a waiver of the right to file a motion to dismiss on grounds other than the challenge to the array. This motion, too, must fall.

In addition to the express waiver, the merits of defendants' motion to dismiss the indictment on ground other than the challenge to the array have been thoroughly discussed and properly disposed of by Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957).[5]

## 4. MOTION FOR A BILL OF PARTICULARS

Defendants' motion for a bill of particulars asks that the government fur-

5. Relevant to defendants' claim that these statutes create a national censorship and restrict the public's access to reading material is the following. John Courtney Murray, We Hold These Truths, Sheed and Ward, Pages 164–165:

"Considerations such as these would seem to indicate that the problem of social freedom is insoluble, if by solution is meant a simple formula that is applicable to all cases and similar for all countries. However, a community can do one important thing; it can decide on the general orientation it wishes to give to its particular solution. We have done this in the United States. We have constitutionally decided that the presumption is in favor of freedom, and that the advocate of constraint must make a convincing argument for its necessity or utility in the particular case.

"I would only add that the presumption in favor of freedom does not rest on doctrinaire grounds. Its basis was not the philosophic rationalism that called itself Enlightenment, but only a political pragmatism more enlightened than the Enlightenment ever was, because it looked to the light of experience to illuminate the prudential norms necessary to guide it in handling a concrete social reality that is vastly complicated. In this light the option was made for the civil freedom of the citizen under a government whose powers are limited, and under a rule of the law whose reach is likewise limited, chiefly by the axiom that the constraints of law must serve the cause of essential social freedom.

"In our case, the consequence of this fundamental option, which gives a basic orientation to our constitutional law, is

that freedom of expression is the rule, and censorship the exception. A more particular further consequence is the ban laid by the First Amendment (exceptional cases apart) on all prior restraint of communications, at the same time that the government reserves the right to punish, subsequently, communications that offend against law. The freedom toward which the American people are fundamentally orientated is a freedom under God, a freedom that knows itself to be bound by the imperatives of the moral law. Antecedently it is presumed that a man will make morally and socially responsible use of his freedom of expression; hence there is to be no prior restraint on it. However, if his use of freedom is irresponsible, he is summoned after the fact to responsibility before the judgment of the law. There are indeed other reasons why prior restraint on communications is outlawed; but none are more fundamental than this.

"After this brief discussion of the central issue involved in censorship I come to my proposition. It may be briefly stated thus: censorship in the civil order ought to be a juridical process. In using the word 'juridical' I mean that the premises and objectives of the process should be defined in accord with the norms of good jurisprudence; that the forms of procedure should be properly judicial; and that the structure and workings of the process should be sustained by the consent of the community. I should maintain that this concept of a juridical process should be verified, *mutatis mutandis*, in every form of censorship, whether governmental or nongovernmental."

nish information concerning seventeen different matters.[6]

■ Requests 1, 2, 3 and 4 seek the standards and geographical limit of the "community". Identical requests have been summarily answered by the courts. United States v. Frew, 187 F.Supp. 500 (CCA, 6th, 1960); Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). Defendants need no further advice to prepare their defense in this regard. See the court's concluding remarks in this opinion.

■ Requests 5, 6 and 7 seek specific reference to parts of the books, or the theme of the book. The indictment

6. 1. Set forth the geographical limits of the "community" under whose standards the book or books are deemed obscene, lewd and indecent, as alleged in Counts 1, 2, 3, 4, 5 and 6 of the indictment.
2. Set forth the standards of the community which were applied in determining that each and every one of the books named in the indictment is obscene, lewd and indecent, as alleged in Counts 1, 2, 3, 4, 5 and 6 of the indictment.
3. Set forth the geographical limits of the "community" under whose standards the books are deemed "obscene, lewd, lascivious and filthy," as alleged in Counts 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18 and 19 of the indictment.
4. Set forth the standards of the community which were applied in determining that each and every one of the books named in Counts 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18 and 19 of the indictment is obscene, lewd, lascivious and filthy, as alleged in the said counts of the indictment.
5. Set forth the dominant theme of each and every one of the books referred to in each and every count of the indictment.
6. Set forth the manner in which the dominant theme of the books referred to in each and every count of the indictment, taken as a whole, and applying contemporary community standards, appeals to the prurient interest of the average person.
7. With respect to each and every book named in each and every count of the indictment, set forth with reference to page numbers and paragraphs those portions which plaintiff claims are "obscene, lewd, and indecent" or "obscene, lewd, lascivious and filthy."
8. With respect to the books named in each and every count of the indictment, state whether the terms "obscene, lewd and indecent," or "obscene, lewd, lascivious and filthy," as alleged in the counts of the indictment are intended to encompass a single concept, to wit, "obscenity," or whether each of the said words is intended to encompass different concepts.
9. If different concepts are intended, state what is meant by the terms "obscene," "lewd," "indecent," "lascivious,"

and "filthy" as alleged in the counts of the indictment.
10. With respect to Counts 1, 2, 3, 4, 5 and 6, respectively, state which of the defendants it is claimed "did knowingly cause the mails to be used for the mailing and carriage in the mails" the certain books named in each of the aforesaid counts of the indictment.
11. With respect to Counts 1, 2, 3, 4, 5 and 6, respectively, state which of the defendants it is claimed "did knowingly cause to be delivered by mail, according to the directions thereon," the certain books named in each of the aforesaid counts of the indictment.
12. With respect to Counts 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18 and 19, respectively, state which of the defendants "did knowingly cause a common carrier to be used for carriage in interstate commerce" of certain books named in each of the aforesaid counts of the indictment.
13. With respect to Counts 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18 and 19, respectively, set forth the names of the common carrier alleged in each of the aforesaid counts of the indictment.
14. With respect to each and every count of the indictment, state whether it is claimed that the defendants knew that the specified books were "obscene, lewd and indecent" or "obscene, lewd, lascivious and filthy" as alleged in the indictment.
15. With respect to each and every count of the indictment, state whether it is claimed that the defendants knew that the specified books were "nonmailable" as alleged in the indictment.
16. If the answers to "12" and "13", above, are in the affirmative, state which of the defendants it is claimed had such knowledge with respect to the books named in each count of the indictment.
17. If the answers to "12" and "13", above, are in the affirmative, set forth in what respects it is claimed that defendants had knowledge that the books named in each count of the indictment were "obscene, lewd, and indecent," "obscene, lewd, lascivious and filthy," and "nonmailable", as alleged in the indictment.

charges that various obscene books were mailed. No specific portion of the book need be named; the matter is to be treated as a whole in determining whether or not it is obscene. The indictment sufficiently informs defendants what it is that is charged as being obscene. As the test set out in Roth v. United States, 354 U.S. 489, 77 S.Ct. 1311, declares, it is:

"Whether to the average person, applying contemporary community standards, *the dominant theme of the material taken as a whole* appeals to prurient interest." (Emphasis supplied.)

 Requests 8 and 9, asking for definitions have been disposed of by the Frew and Roth cases cited above.

 Requests 10, 11 and 12 ask that the government state which of the defendants "did knowingly cause the mail to be used". The indictment is clear. It charges each and every defendant in each and every count.

 Defendants know the answer to request 13 better than the government. Certainly one who sends books by common carrier knows which common carrier.

 Requests 14, 15, 16 and 17 deal with knowledge under the statute. The requests seek evidentiary matter. These requests do not require an answer.

The defendants' motion for a bill of particulars is denied.

5. MOTION FOR RENEWAL AND REARGUMENT OF THE MOTION TO TRANSFER.

 The defendants' motion to reargue the motion to transfer is based on the following grounds:

"1. The principal reason for the denial of the said motion for transfer was the conclusion that a transfer to the Southern District of California would deprive the citizens of the Western District of Michigan of the opportunity to determine whether the books named in the indictment are obscene under 'local community standards', * * * in Manual Enterprises, Inc. v. Day, 370 U.S. 478, 82 S.Ct. 1432 [8 L.Ed.2d 639] (June 25, 1962) * * * Mr. Justice Harlan held that the 'proper test under the federal statute' is a 'national standard' * * *.

"2. * * * Since the ruling of the court denying the said motion for transfer, the defendant Sanford E. Aday has suffered a heart occlusion from which recovery has been slow and the danger to his life extreme from any unusual exertion, and coupled with the death of the defendant Matthew Meehan from a heart attack, the physical and economic conditions of the defendants have greatly worsened, thus continually endangering defendants' opportunity for a fair trial if the proceedings are not transferred to the place of their residence and business establishment."

As the court earlier pointed out, Senior Judge Raymond W. Starr, then Chief Judge, denied defendants' first motion to transfer in a careful, well reasoned opinion entered on February 13, 1962.

Defendants seek to attack his denial on two grounds: the effect of the Manual case, and the subsequent change in health of the defendant Sanford E. Aday.

Rule 21(b) of the Federal Rules of Criminal Procedure provides that a transfer shall be allowed "if the court is satisfied that in the interest of justice the proceeding should be transferred * *." Defendant has submitted two doctors' affidavits in support of his claim that the health of defendant Aday compels this court to transfer.

After reading the affidavits, and listening to the arguments of counsel on this motion, the court is not persuaded that health or economic conditions have so changed so as to rule contrary to Judge Starr's original holding.

Defendants' second argument runs as follows: the main reason Judge Starr denied transfer was to give a jury here a chance to apply "local community stand-

ards" in determining whether or not the material in question is obscene; the case of Manual v. Day, supra, declares that the relevant community is a "national" community. Therefore, Judge Starr's major ground for denial has disappeared and transfer should be allowed.

A careful reading of the Roth case, the Manual case, and Judge Starr's opinion leads me to the conclusion that this position is not well taken.

As pointed out in Judge Starr's opinion, "In United States v. Frew, D.C., 187 F.Supp. 500, 507, (Judge O'Sullivan, of the Sixth Circuit Court of Appeals, sitting as a district court judge) the court said:

\* \* \* \* \* \*

"'Defendants also assert that because in their business they transmit their materials throughout the entire United States, it would be placing an undue burden upon them to be required to know in advance the community standards of each locality into which they propose to send their material. One who chooses to carry on an enterprise which might indeed offend criminal statutes enforceable in places in which he proposes to carry on his enterprise, must take the hazards involved. United States v. Wurzbach, [280 U. S. 396, 50 S.Ct. 167, 74 L.Ed. 508] supra. *It is not the duty of the courts in enforcing the law or of Congress in enacting statutes to advise in advance the likely reaction of juries in each community in which an individual chooses to carry on his activities.*

"'\* \* \* *The law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree. If his judgment is wrong, not only may he incur a fine or a short imprisonment, as here; he may incur the penalty of death.'* Nash v. United States, 229 U.S. 373, 377, 33 S.Ct. 780, 781, 57 L.Ed. 1232." (Emphasis supplied.)

"In Toscano v. Olesen, D.C., 184 F.Supp. 296, 297, Judge Yankwich said:

"'An Indictment for violation of § 1461 of the United States Penal Code (18 U.S.C. § 1461) was returned against the plaintiff on April 22, 1960, in the United States District Court for the Northern District of Texas, Dallas Division. Six counts of mailing unmailable matter were contained in the Indictment, alleging mailings at Los Angeles to different persons in the Texas district. This was done under the 1958 amendment to the section which allows prosecutions either in the district of mailing or the district of delivery. The object of this statute is "to make it possible to prosecute violators of section 1461 of title 18 of the United States Code (mailing of obscene or crime-inciting matter) *not only at the place at which the objectionable matter is mailed, but also at the place of address or delivery.*" (Senate Report No. 1839, U.S.Code Congressional and Administrative News, 1958, Vol. 2, p. 4012.) \* \* \*

"'As the Congress has clearly and constitutionally expressed the intent to consider mailing of obscene matter a partly continuous offense by allowing prosecution at either end, we need not concern ourselves with the possible hardship resulting from the exercise of this power. For that *affects policy.* Our function is *merely to give effect to it.'*"

"In Roth v. United States, supra, in considering the defendants' contention that the Federal obscenity statute, § 1461, was unconstitutional, the court held that neither the statute nor its application under various contemporary local community standards was unconstitutional. The court said, 354 U.S. at pages 488–492, 77 S.Ct. at pages 1311 [1313]:

"The early leading standard of obscenity allowed material to be judged merely by the effect of an

isolated excerpt upon particularly susceptible persons. Regina v. Hicklin, (1868) L.R. 3 Q.B. 360. Some American courts adopted this standard but later decisions have rejected it and substituted this test: whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest. The Hicklin test, judging obscenity by the effect of isolated passages upon the most susceptible persons, might well encompass material legitimately treating with sex, and so it must be rejected as unconstitutionally restrictive of the freedoms of speech and press. On the other hand, the substituted standard provides safeguards adequate to withstand the charge of constitutional infirmity. * * *

" 'It is argued that the statutes do not provide reasonably ascertainable standards of guilt and therefore violate the constitutional requirements of due process. Winters v. People of State of New York, 333 U.S. 507 [68 S.Ct. 665, 92 L.Ed. 840]. The federal obscenity statute makes punishable the mailing of material that is "obscene, lewd, lascivious, or filthy * * * or other publication of an indecent character." * * * The thrust of the argument is that these words are not sufficiently precise because they do not mean the same thing to all people, all the time, everywhere.

" 'Many decisions have recognized that these terms of obscenity statutes are not precise. This Court, however, has consistently held that lack of precision is not itself offensive to the requirements of due process. " * * * [T]he Constitution does not require impossible standards"; all that is required is that the language "conveys sufficiently defin-

ite warning as to the proscribed conduct when measured by common understanding and practices * * *." United States v. Petrillo, 322 U.S. 1, 7–8 [67 S.Ct. 1538, 1542, 91 L.Ed. 1877]. These words, applied according to the proper standard for judging obscenity, already discussed, give adequate warning of the conduct proscribed and mark " * * * boundaries sufficiently distinct for judges and juries fairly to administer the law * * *. That there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls is no sufficient reason to hold the language too ambiguous to define a criminal offense * * *." Id., [332 U.S. at page] 7 [67 S.Ct. at page 1542]. See also United States v. Harriss, 347 U.S. 612, 624, note 15 [74 S. Ct. 808, [815]. 98 L.Ed. 989]; Boyce Motor Lines, Inc. v. United States, 342 U.S. 337, [377] 340 [72 S.Ct. 329, 330, 96 L.Ed. 367]; United States v. Ragen, 314 U.S. 513, 523–524 [62 S.Ct. 374, 378, 86 L.Ed. 383]; United States v. Wurzbach, 280 U.S. 396 [50 S.Ct. 167, 74 L.Ed. 508]; Hygrade Provision Co. v. Sherman, 266 U.S. 497 [45 S.Ct. 141, 69 L.Ed. 402]; Fox v. State of Washington, 236 U.S. 273 [35 S.Ct. 383, 59 L.Ed. 573]; Nash v. United States, 229 U.S. 373 [33 S.Ct. 780, 57 L.Ed. 1232].

" 'In summary, then, we hold that these statutes, applied according to the proper standard for judging obscenity, do not offend constitutional safeguards against convictions based upon protected material, or fail to give men in acting adequate notice of what is prohibited.' "

In addition, note 30 of the majority's opinion in the Roth case is as follows:

"30. It is argued that because juries may reach different conclu-

sions as to the same material, the statutes must be held to be insufficiently precise to satisfy due process requirements. But, it is common experience that different juries may reach different results under any criminal statute. That is one of the consequences we accept under our jury system. Cf. Dunlop v. United States, 165 U.S. 486, 499–500" 17 S.Ct. 375, [379–380] 41 L.Ed. 799, 803.

■ The Fourteenth Amendment as a restriction upon the states imposes the same burden upon the states as does the First Amendment upon Congress, because these rights are *fundamental* rights implicit in the concept of "ordered justice and liberty". Hurtado v. People of State of California, 110 U.S. 516, 4 S. Ct. 111, 28 L.Ed. 232 (1884); Palko v. State of Connecticut, 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288 (1937); Adamson v. People of State of California, 332 U.S. 46, 67 S.Ct. 1672, 91 L.Ed. 1903 (1947); Bartkus v. People of State of Illinois, 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959).[7]

The state courts have no more liberty in connection with these fundamental freedoms than do the federal courts.[8]

In this respect, the instruction set out 354 U.S. on Page 490, 77 S.Ct. on page 1312 of the Roth case:

"In this case, ladies and gentlemen of the jury, you and you alone are the exclusive judges of what the common conscience of the community is, and in determining that conscience you are to consider the community as a whole, young and old, educated and uneducated, the religious and the irreligious—men, women and children,"

can apply all across the country in state or federal courts.

The distinguishing characteristic, however, is that individual juries may reach different results in evaluating the same facts and the same rules of law applied to facts.

■ "The common conscience of the community" is to be determined by a jury in the district in which the action is brought. It was the intent of Congress that this action could be brought in this district, where the material had been disseminated.

It is the opportunity for a jury in this district to determine "whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest" (see Roth v. U. S., 354 U.S. 489, 77 S.Ct. 1311, 1 L.Ed.2d 1509) that must be protected in denying the transfer to the Southern District of California. In Volanski v. U. S., 246 F.2d 842 (CCA, 6th, 1957), Circuit

---

7. There is a body of opinion written by some justices of the United States Supreme Court, past and present, that the Fourteenth Amendment "incorporates" the Bill of Rights as restrictions upon the states to the same extent as the Bill of Rights restricts the federal government. Whether by the "fundamental rights" theory, or the "incorporation" theory, all justices are in agreement that the First Amendment freedoms equally restrict and limit states as well as federal government. Cantwell v. State of Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L. Ed. 216 (1952); United States v. Rumely, 345 U.S. 41, 73 S.Ct. 543, 97 L.Ed. 770 (1952); NAACP v. State of Ala-

bama, 357 U.S. 449, 78 S.Ct. 1163, 2 L. Ed.2d 1488 (1958); Bates v. City of Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960); State of Louisiana ex rel. Gremillion v. NAACP, 366 U.S. 293, 81 S.Ct. 1333, 6 L.Ed.2d 301 (1961); Communist Party of U. S. v. Subversive Activities Control Board, 367 U.S 1, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961).

8. Note in this connection note 31 in Roth v. U. S., supra:
"31. For the same reason, we reject, in this case, the argument that there is greater latitude for state action under the word 'liberty' under the Fourteenth Amendment than is allowed to Congress by the language of the First Amendment."

Judge Potter Stewart, now Supreme Court Justice, said:

"Obscenity is not to be measured by the reactions of any particular class or group of the population, but by the standard of the community as a whole. Perhaps the best known American decision in this field of law is United States v. One Book Entitled 'Ulysses,' 2 Cir., 1934, 72 F. 2d 705, affirming D.C.S.D.N.Y., 1933, 5 F.Supp. 182. District Judge Woolsey's opinion in that case admirably states the correct test of obscenity. What must be measured is 'its effect on a person with average sex instincts—what the French would call *l'homme moyen sensuel*—who plays in this branch of legal inquiry, the same role of hypothetical reagent as does the "reasonable man" in the law of torts and "the man learned in the art" on questions of invention in patent law.' 5 F.Supp. 184. 'It is only with the normal person that the law is concerned.' 5 F.Supp. 185.

"This now generally accepted test seems to have been first advanced by Learned Hand, then a district judge, when he said, 'To put thought in leash to the average conscience of the time is perhaps tolerable, but to fetter it by the necessities of the lowest and least capable seems a fatal policy.' United States v. Kennerley, D.C.S.D.N.Y., 1913, 209 F. 119, 121.

\*　\*　\*　\*　\*　\*

" \* \* \* '[O]bscenity' is a function of many variables, and the verdict of the jury is not the conclusion of a syllogism of which they are to find only the minor premise, but really a small bit of legislation *ad hoc,* like the standard of care. United States v. Levine, 2 Cir., 1936, 83 F. 2d 156, 157. A trial court can best determine 'the present critical point in the compromise between candor and shame at which the community may have arrived here and now.' A trial court, particularly with the aid of a jury, can best determine 'the average conscience of the time.' United States v. Kennerley, D.C.S.D. N.Y.1913, 209 F. 119, 121.'"

This is what I had in mind when I said from the bench on the hearing of oral arguments in this case, that the problem of standards, as between Roth and Manual, could be handled in the instructions to the petit jury.

The Manual case may be distinguished from the present case and from the Roth case. The Manual case in its judicial growth never came before a jury. A postmaster in Alexandria, Virginia, detained the questioned material; a hearing before the judicial officer of the Post Office Department ensued. The Post Office Department ruled that the material was "obscene"; this was affirmed by the District and Circuit Court.

Only two Justices treated the Manual case as one of "standards"—Justices Harlan and Stewart. Justices Brennan, Warren and Douglas concurred on the grounds that Congress by enactment of 18 U.S.C. § 1461 had not authorized the Postmaster General to censor obscenity. Justice Clark dissented on the grounds that the statute required the Postmaster to reject non-mailable matter. The other three Justices did not sit.

The motion to reargue the motion to transfer is denied.

### 6. MOTION TO REDUCE BOND.

At the hearing on March 15, 1963, the court reduced the bond of defendants to $5,000 each, thus disposing of this motion.

An order has been entered accordingly.