UNITED STATES of America,
Plaintiff,

v.

WEST COAST NEWS COMPANY, Inc.,
a California corporation, Sanford E.
Aday and Wallace De Ortega Maxey,
Defendants.

No. 6615.

United States District Court
W. D. Michigan, S. D.

March 25, 1964.

See also D.C., 30 F.R.D. 13.

172

George E. Hill, Dist. Atty., Robert G. Quinn, Asst. Dist. Atty., Grand Rapids, Mich., Marshall Tamor Golding, Justice Dept., Washington, D. C., for plaintiff.

Stanley Fleishman, Hollywood, Cal., VanderVeen, Freihofer & Cook, Grand

Rapids, Mich., George R. Cook, Grand Rapids, Mich., of counsel, for defendants.

FOX, District Judge.

On May 24, 1960, the grand jury returned a nineteen count indictment charging the defendants [1] with mailing or transporting in interstate commerce eight obscene books, in violation of Title 18 U.S.C. §§ 1461 and 1462.

After protracted pretrial matters had been disposed of,[2] the trial by jury began October 29, 1963, and ended December 10, 1963.[3]

The jury returned a verdict of guilty on five counts: 6, 10, 12, 13 and 14.[4]

[1] One of the original defendants, Matthew Meehan, died before arraignment.

[2] See this court's opinion on defendants' motion to transfer, motion to dismiss the indictment because of the alleged invalidity of the grand jury, motion to dismiss the indictment, motion for a bill of particulars, motion for renewal and reargument of the motion to transfer, and motion to reduce bond, reported at 216 F.Supp. 911 (1963).
A writ of mandamus against this court was denied by the Circuit Court of Appeals, Sixth Circuit, 318 F.2d 588. Motion for leave to file a Petition for Writ of Mandamus was denied by the Supreme Court of the United States June 17, 1963, 374 U.S. 823, 83 S.Ct. 1921, 10 L.Ed.2d 1081.

[3] The court adjourned from November 22, 1963, 1:00 P.M. to December 2, 1963, 10:00 A.M., in respectful remembrance of President Kennedy.

[4] Count 6
That on or about August 24, 1949, WEST COAST NEWS COMPANY, INC., a California Corporation, and its directors, shareholders, and officers, SANFORD E. ADAY, WALLACE DE ORTEGA MAXEY, and MATTHEW MEEHAN, did knowingly cause the mails to be used for mailing and carriage in the mails, and did knowingly cause to be delivered by mail, according to the direction thereon, certain obscene, lewd, and indecent books, from Fresno, California, to Scherer News Agency in the City of Battle Creek, in Calhoun County, in the Southern Division of the Western District of Michigan, to wit, 100 copies, more or less, of a book entitled "Sex Life of a Cop," bearing Code No. SA-11, the author's name given as Oscar Peck, and published by Mid-Tower Publishing Company, which books were nonmailable under the provisions of Title 18, Section 1461, of the United States Code.
Count 10
That on or about September 30, 1959, WEST COAST NEWS COMPANY, INC., a California Corporation, and its directors, shareholders, and officers, SANFORD E. ADAY, WALLACE DE ORTEGA MAXEY, and MATTHEW MEEHAN, did knowingly cause a common carrier to be used for carriage in interstate commerce of certain obscene, lewd, lascivious, and filthy books, from Fresno, California, to City News Agency in the City of Kalamazoo, in Kalamazoo County, in the Southern Division of the Western District of Michigan, to wit, 100 copies, more or less, of a book entitled "Sex Life of a Cop," bearing Code No. SA-11, the author's name given as Oscar Peck, and published by Mid-Tower Publishing Company, and 50 copies, more or less, of a book entitled "The Black Night," bearing Code No. Z-112, the author's name given as Betty Short, and published by Fabian Books, Ltd.
Count 12
That from August 4, 1959, to August 11, 1959, both dates being approximate and inclusive, WEST COAST NEWS COMPANY, INC., a California Corporation, and its directors, shareholders and officers, SANFORD E. ADAY, WALLACE DE ORTEGA MAXEY, and MATTHEW MEEHAN, did knowingly cause a common carrier to be used for carriage in interstate commerce of certain obscene, lewd, lascivious, and filthy books, from Fresno, California, to Bert's Cigar Store in the City of Grand Rapids, in Kent County, in the Southern Division of the Western District of Michigan, to wit, 100 copies, more or less, of a book entitled "Sex Life of a Cop," bearing Code No. SA-11, the author's name given as Oscar Peck, and published by Mid-Tower Publishing Company, 15 copies, more or less, of a book entitled "Desperate Moments," bearing Code No. SA-4, the author's name given as Graham Roberts, and published by Saber Books, 10 copies, more or less, of a book entitled "Love Princess," bearing Code No. SA-5, the author's name given as Orrie Hitt, and published by Saber Books, and 20 copies, more or less, of a book entitled "never enough," bearing Code No. SA-8, the author's name giv-

The jury also reported that it was unable to agree on any of the other counts.[5]

At the close of the government's proof, at the close of the trial and before sentence, the court denied defendants' motions for judgment of acquittal, in arrest of judgment, and for a new trial.[6] In the course of its rulings on these post-trial motions, the court referred to some of its opinions written during the trial.

It is the purpose of this omnibus opinion to correlate certain written opinions by the court to the rulings made on the post-trial motions.

The main issues raised by these three motions can be grouped as follows:

1. Constitutionality of statutes;
2. Presentation of the challenged books to the jury;
3. Double jeopardy, res judicata, estoppel;
4. Expert witnesses;
5. Comparative evidence; and
6. Sufficiency of the evidence.

Other specific grounds relied upon in these motions require no expanded comment.[7]

---

en as Byron Woolfe, and published by Saber Books.

Count 13
  That on or about August 6, 1959,
    WEST COAST NEWS COMPANY, INC., a California Corporation, and its directors, shareholders, and officers, SANFORD E. ADAY, WALLACE DE ORTEGA MAXEY, and MATTHEW MEEHAN,
did knowingly cause a common carrier to be used for carriage in interstate commerce of certain obscene, lewd, lascivious, and filthy books, from Fresno, California, to City News Agency in the City of Kalamazoo, in Kalamazoo County, in the Southern Division of the Western District of Michigan, to wit, copies of a certain book entitled "Desperate Moments," bearing Code No. SA-4, the author's name given as Graham Roberts, and published by Saber Books, copies of a certain book entitled "never enough," bearing Code No. SA-8, the author's name given as Byron Woolfe, and published by Saber Books, copies of a certain book entitled "Sex Life of a Cop," bearing Code No. SA-11, the author's name given as Oscar Peck, and published by Mid-Tower Publishing Company, and copies of a certain book entitled "Love Princess," bearing Code No. SA-5, the author's name given as Orrie Hitt, and published by Saber Books.

Count 14
  That from August 4, 1959, to August 13, 1959, both dates being approximate and inclusive,
    WEST COAST NEWS COMPANY, INC., a California Corporation, and its directors, shareholders, and officers, SANFORD E. ADAY, WALLACE DE ORTEGA MAXEY, and MATTHEW MEEHAN,

did knowingly cause a common carrier to be used for carriage in interstate commerce of certain obscene, lewd, lascivious, and filthy books, from Fresno, California, to Uptown News Stand in the City of Muskegon, in Muskegon County, in the Southern Division of the Western District of Michigan, to wit, 200 copies, more or less, of a book entitled "Sex Life of a Cop," bearing Code No. SA-11, the author's name given as Oscar Peck, and published by Mid-Tower Publishing Company, 25 copies, more or less, of a book entitled "Love Princess," bearing Code No. SA-5, the author's name given as Orrie Hitt, and published by Saber Books, and 25 copies, more or less, of a book entitled "never enough," bearing Code No. SA-8, the author's name given as Byron Woolfe, and published by Saber Books.

5. Count 3 was withdrawn by the government during the course of the trial.

6. Among other motions, both oral and written, denied by the court during the course of the trial were: Motion for opening of the jury box and examination of the names of jurors; motion challenging the petit jury array; renewal of the motion to dismiss the indictment because of illegal selection of the grand jury; renewal of all motions prior to trial; motion to dismiss the entire jury panel and quash the jury list; motion to dismiss due to alleged incompetent jury; motion to inquire as to grand jury proceedings and quash indictment; motion to suppress testimony.

7. Some of the grounds relied upon are sufficiently covered by the court's reported opinion in 216 F.Supp. 911. Motion in arrest of judgment: ¶ 1 and 2; motion for new trial: ¶ 1, 2 and 4.

The court's opinion on these six issues follows:

## 1. CONSTITUTIONALITY OF STATUTES.[8]

In this area, defendants seek again to relitigate the issues before the United States Supreme Court in Roth v. United States, 354 U.S. 476, 489, 77 S.Ct. 1304, 1311, 1 L.Ed.2d 1498, 1509. This court need not discuss the various themes of unconstitutionality now claimed by defendants. Further treatment of the constitutional issues is superfluous.

## 2. PRESENTATION OF THE CHALLENGED BOOKS TO THE JURY.[9]

After this issue was raised by the parties in the course of the trial, the court filed a memorandum opinion resolving that point. That opinion follows.

However, one comment should be made first. During the course of the trial, defendants' counsel, Mr. Fleishman, repeatedly misinterpreted the court's use of the term "indicted books." He argued that the books were on trial, and that the court was trying to censor the books. The court wants to make it clear, once and for all, that whenever the court referred to the eight books involved, in this case, as the "indicted books," it did so only as a matter of descriptive convenience. In this opinion, we shall refer to the material as the challenged books.

As the court frequently pointed out during the course of the trial, this court does not consider the books to be on trial; the defendants, as persons, are on trial. See Chief Justice Warren's statement in his concurring opinion in Roth v. United States, supra, 354 U.S. page 495, 77 S.Ct. 1304, 1 L.Ed.2d 1498.

Minor changes have been made in the previously written opinions for the purpose of clarification. Footnote numbers have been changed to correspond with the omnibus opinion.

At a pretrial conference in this matter held on Wednesday, October 23, 1963, the United States Government first proposed a procedure for submitting the books to the jury. At that time, the government proposed that the books themselves be submitted to the jury to be read by the jurors in the jury room, with instructions to read the books and not discuss them. This was suggested by the government in contradistinction to the predicted claim by the defense that the books should be read aloud in the court room.

At that pretrial, defense counsel refused to stipulate to this procedure.

At a continuation of the conference on pretrial matters, held October 28, 1963, the government reiterated its position as to this procedure. At that time the following conversation took place:

"MR. FLEISHMAN: It is our view that the books should be read and must be read to the jurors as part of the public trial since the books really are on trial, that they are charged with being obscene.

"THE COURT: According to Chief Justice Warren, it is not the books that are on trial exactly, it is the individual and individual's conduct and the books are a part of the picture of the individual's conduct.

"MR. FLEISHMAN: * * * The nub of the question here is that these books are obscene and since that is a crucial aspect, we do not believe that at a public trial, that is required and anything short of that would be a denial of a public trial.

"THE COURT: Well, I won't rule on that proposition at the moment

---

8. Motion for acquittal at close of government's proof: Counts 1, 2, 5, 6, 10–16, ¶ 12(a), (b), (c), (f); Counts 4, 17–19, ¶ 13(a), (b), (c), (f); Counts 7–9, ¶ 11(a), (b), (c), (f). Motion in arrest of judgment: ¶ 4(A), (B), (C), (D), (E), (F): ¶ 5(A), (B), (C), (D), (E), (F).

9. Motion for acquittal at the close of the government's proof: Counts 1, 2, 5, 6, 10–16, ¶ 12(e); Counts 4, 17–19, ¶ 13(e); Counts 7–9, ¶ 11(e).
Motion for acquittal at the close of the government's proof: Count 4, ¶ 12; Count 10, ¶ 11; Count 17, ¶ 12; Count 18, ¶ 12; Count 19, ¶ 12; motion for new trial: ¶ 13 and 18.

either. I'll consider it. Anything else?" [10]

The procedure for submitting books to the jury has varied over the years. At one time it was deemed proper to have the portions of an obscene character read to the jury by the prosecution, and the other portions essential to a proper understanding of what was read by the prosecution to be read to the jury by the defendants. Burton v. United States, 142 F. 57 (CCA 8, 1906). This procedure undoubtedly would be error today because of the decision in Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L. Ed.2d 1498, which held that each book must be considered as a *whole*.

In another very early case concerning obscenity, the defendant claimed error, in that the court permitted letters under indictment to be taken by the jury to the jury room without first having been read to the jury or by the jury upon the trial. Winters v. United States, 201 F. 845 (CCA 8, 1912). The court noted that defendant made no objection to this procedure and that the defendant had never waived any objection to this procedure. The court also added that it would have been better practice to have the letters either read to the jury, or given to the jury and with each one of the jurors required to read them while the case was on trial.

■ It is common procedure in criminal cases to permit papers or documents which are in evidence to be taken by the jury on their retirement.[11]

Since each of the books in the indictment has been admitted into evidence in this case as an exhibit, it may at first appear that these general rules of evidence apply. It may be that in some cases, however, where the facts involved demand that the exhibits not be taken by

the jury to the jury room, the general rules do not apply; and, therefore, the question is said to reside within the discretion of the trial judge. Little v. United States, 73 F.2d 861 (CCA 10, 1934); Buckley v. United States, 33 F. 2d 713 (CCA 6, 1929); 12 Cyclopedia of Federal Procedure, Third Edition, Section 48.323; and Robinson v. United States, 93 U.S.App.D.C. 347, 210 F.2d 29 (CCA D.C.1954).

The courts have not been ignorant of the time factor questions involved in submitting matters to the jury for their consideration. In United States v. Rebhuhn, 109 F.2d 512 (CCA 2, 1940), the offered matter consisted of circulars which advertised books for sale. The court found the question on appeal to be whether books and the circulars were obscene; on appeal the defendant objected that the jury did not adequately examine the evidence and defendant relied upon the fact that the jury had deliberated only three hours.

Judge Learned Hand in writing for the court, held that the time element was a question for the judge in deciding whether to grant a new trial, and found that the point was wholly without merit.

It may be that the "book as a whole" test established by the Roth case, supra, would have forced Judge Hand to rule differently if that case were to arise now; but the fact is that this case is still authority for the proposition that the evidence may be submitted to the jury for their reading.

The only other reference to this procedure in a great number of early cases dealing with obscenity is found in Swearingen v. United States, 161 U.S. 446, 16 S.Ct. 562, 40 L.Ed. 765 (1896). That opinion merely discloses that the article

10. At side bar at the close of the proceedings on October 29, 1963 the court made a ruling that the books would be read aloud to the jury. Not having read the case material that was available at that time, particularly the case of Alexander v. United States, 271 F.2d 140 (CCA 8, 1959, the main purpose of the ruling was procedural—that is, to give

the government an opportunity to prepare for the reading of the books out loud to the jury. Upon reconsideration, the final decision of the court is embodied in this opinion.

11. For a general discussion of the early history of this rule, see Rumely v. United States, 2 Cir., 293 F. 532, at 557, et seq.

was read to the jury and there exists no comment in that case to add any assistance to the court's determination here.

On the other hand, a very few cases, Yudkin v. State of Maryland, 229 Md. 223, 182 A.2d 798 (1962), just as cryptically stated that prior to the close of the state's case, the trial court sent the jury to the jury room to read the book in question.

The clearest and most inclusive discussion of this issue known to the court is found in the opinion for the United States Court of Appeals for the Eighth Circuit in Alexander v. United States, 271 F.2d 140 (1959).

The Alexander case involved a jury trial on two counts charging violation of Title 18 U.S.C.A. § 1462. The counts named certain books as being obscene: "The Hot Rod;" "The Lion's Den;" "The Sex Factory;" "Becky McLane;" and "New Virginia Bell."

The statement of this case reveals that the Government first requested permission to read one of the allegedly obscene books to the jury. The request was denied, even after the Government had pointed out that the Roth case, supra, required consideration by the jury of the book in its entirety.

Counsel for the defendants moved that the two of the books be read to the jury. This motion was likewise denied. The court's opinion in this regard is as follows:

"Defendant's further claim that the court committed prejudicial error in overruling his motion to have 'Mr. Hot Rod' and 'The Lion's Den' read to the jury in open court is without merit. Both the Government and defendant had asked that the books be read to the jury. The books were in evidence as Government Exhibits and were taken into the jury room by the jury. The books constituted part of the evidence in the case, whether or not they were read to the jury in the court room. It was, of course, necessary for the jury to have knowledge of the contents of the books in order to properly arrive at their verdict. *Whether such knowledge was obtained by their own reading of the books or by having the books read to them is a matter of no importance. The court instructed the jury in part as follows*:

"'Of course, you remember, in order to judge this matter, it's necessary for you to judge the material as a whole. Of necessity that is going to mean that you examine particularly the five exhibits which have been introduced, "Mr. Hot Rod" and "The Lion's Den," and the other three pieces of evidence which are the principal pieces of evidence in this case. * * *

"'Give it a fair and honest consideration and take your time about it, and then return with the verdict that you think is fair and just in this matter.'

"We believe that under the peculiar circumstances of this case *it rested in the sound discretion of the court whether or not the books should be read to the jury in open court,* and that the court did not abuse its discretion in refusing permission to read the books to the jury. In Winters v. United States, 8 Cir., 201 F. 845, a case involving a prosecution for sending obscene letters through the mails, we held that the court's refusal to permit the reading of the letters to the jury did not constitute reversible error.

"In our present case the jury consisted of eleven men and one woman. Our examination of the books leads us to believe that the reading of books of the type here involved in open court in the presence of both men and women would likely have proven embarrassing to everyone present in the court room. Moreover, the reading of the books would have required considerable time that might more profitably be used by the court and its staff in disposing of

other litigation. One of the books contained 183 pages and the other, 184 pages. The defendant has cited no cases, nor have we found any, to the effect that failure to read the contents of exhibits which have been admitted in evidence and are available for examination in the jury room constitutes prejudicial error. *We can see no reason why the jury could not reach as complete an understanding of the contents of the books through their own reading of such books in the jury room as they could have obtained through the reading of the books to them in open court."* (Emphasis supplied.)

Some of the difficulties pointed out by the court in the Alexander case apply in this case. For example, there are seven women serving on the jury in this case, including the alternates. While the court has been in session, other women have been spectators. This is not to imply that the embarrassment of reading out loud should conclusively foreclose that reading; it is merely one of the factors.

The court's point in the Alexander case that the reading of the books would require considerable time which might more profitably be used by the court and its staff, is also relevant to this case. It is difficult to predict exactly how much time would be saved by reading the books out loud, or by having each juror read each book silently, for this depends largely upon the reading ability of the reader, or each individual juror. However, to relieve the court for time to consider all the issues yet involved in this case, is a desirable result.[12] It likewise affords counsel additional time to prepare memorandum briefs on issues before the court, or issues anticipated to come before the court.

The clear import of the "book as a whole" test set out in the Roth case, su-

pra, is that the book necessarily must be read from beginning to end, and in a normal fashion, in order to ascertain its character. The court does not think it could fairly be claimed that these books were intended to be read out loud; to the contrary, they were intended to be read silently by the readers.

Reading out loud, therefore, would be inconsistent with the nature of the book, and may under a particular set of circumstances, be unfair to one side or the other.

It is also patently clear that each individual reader reads at his own rate of speed. The variation, then, between the speed of the person reading the book out loud and the speed of each individual juror would also have its effect upon each juror's comprehension of the true character of the book. Some readers, because of their abilities, must necessarily stop and reread in order to understand the context of a passage. This would be virtually impossible if the books were read out loud. The result might well be that by following the person reading the book out loud, the very slow reader would be able to remember or catch only the allegedly obscene parts. This certainly would work an injustice on the defendants.

■ The books involved have been admitted as evidence and marked as exhibits in this case. The party offering them as exhibits has chosen not to read the exhibits in their entirety to the jury. From the foregoing discussion, there is no compelling reason why the court should require the party offering the exhibits to read the exhibits to the jury.

There are two alternatives as to the time when the jurors should be allowed to read the books. The books in the case of Alexander apparently were read by the jurors at the close of the trial; while the books in the Yudkin case were read

12. The length of each book challenged in this case is as follows:

Witch Finder—141 pages
Love Princess—140 pages
Decisive Years—151 pages
Sex Life of a Cop—142 pages
The Black Night—126 pages
Desperate Moments—154 pages
Never Enough—142 pages
I am a Lesbian—119 pages

at the close of the state's case.[13] The latter procedure is more logical in the opinion of this court. The books are an important part of the evidence submitted by the Government in proof of its case.

While these books are exhibits and, therefore, before the jury, and while the Government's case would not be subject to dismissal if they were not read at this time, since they are exhibits this court believes that under proper guidance the jury can best perform its functions in this case by reading them at the close of the Government's case.

A few of the specific reasons why this is the best procedure to follow are:

The jury can best understand the testimony of any subsequent witness on defense as that testimony may relate to more difficult issues involved as to the books themselves. Also, the jury would be in a much better position to understand the rather intricate instructions involved in a case of this nature if they have read the material before the instructions.

The procedure in the Yudkin case and that proposed here is actually the most common procedure for placing an exhibit before the jury. The party offering the exhibit may request that it be tendered to the jury; once this is done, all activity is usually suspended until the jury has an opportunity to examine the exhibit.

Defendants apparently fully rest their objection to any procedure other than reading the books out loud on the grounds that this would effectively deny them of a public trial, in that the books, being important evidence, would be submitted to the jury outside the presence of the defendants. Without passing upon the merits of this claim, and doing nothing more than noting that defendants have not given the court any authority to support this claim, the procedure this court intends to follow fully satisfies the objection of the defendants.

The Government has a sufficient number of copies of certain books so that each juror may have one of each book to read. The identity of these copies introduced for reading only with those copies introduced as exhibits in the course of the Government's case, is supported by the evidence of copyrights for each of the copies, showing no new matter added to these publications. The evidence of the copyright is by itself adequate sanction to allow a sufficient number of the books into evidence for the purpose of reading by the jury.

For those books where problems arise as to identity, either by virtue of lack of copyright, or some other problem, the court will rule specifically at the time that book is presented for reading.

The books in this case will be given to the jury immediately before the Government rests its case. The jurors will remain in the court room and read each of the books silently pursuant to the court's instructions.

The defendants and their counsel shall remain in the court room at the same time.

The court's bailiff will be available so that he may administer the jury's needs.

The court reporter shall remain in the court room at all times while the books are being read, so that any communication which may be made shall be properly recorded.

The Judge shall also remain in the court room.

The trial continues in all respects in open court in the presence of the defendants, the Government, the Judge, and the jury. All objections of the defendants are answered and overruled.

This is the end of the court's memorandum opinion on the presentation of the books to the jury.

## 3. DOUBLE JEOPARDY, RES JUDICATA, ESTOPPEL.

Defendants' claim in their motions, and many times throughout the trial,

13. This is the procedure followed in Great Britain. See, for example, Regina v. Penguin Books, Ltd., 1960, unreported; discussed in "The Banned Books of England," by Alec Craig, at Pages 164, 165.

raising this issue, can be summarized in quoting their motion for judgment of acquittal, Count 4, ¶2:

"The lodged and filed exemplified copy of Count "One" of the prior indictment which names *The Black Night* and the exemplified copy of the jury proceedings reflecting a jury acquittal on said Count "One" in the case of United States v. Aday in the United States District Court for the Southern District of California, Northern Division, entitles defendant Aday to an acquittal pursuant to the command of the Fifth Amendment to the United States Constitution prohibiting double jeopardy and the denial of due process of law and pursuant to the principles of *res judicata* and estoppel."

Counsel for the defendants, Mr. Fleishman, persistently during the course of the trial, tried to convey the impression that the book, *The Black Night*, had been found to be not obscene. This finding was then said to be binding in some way upon this court and jury.

First, Mr. Fleishman himself has contradicted this assertion. In his affidavit in support of the motion to dismiss the indictment, filed March 30, 1962, he said:

"The jury return (sic) a verdict of not guilty on the said first count, the prosecutor submitting only the book *The Rambling Maids* by Betty Short to the jury."

By his own sworn statement, it is clear that the jury did not even consider the book, *The Black Night*, in the District Court case in California.[14]

■ Secondly, defendant Aday was not charged with the same offense in the District Court in California as that with which he is charged in this case. Besides the fact that the book, *The Black Night*, was never submitted to the jury, the indictment in that case charged transporta-

tion of that book to different places on different dates than the indictment in this case. See 18 U.S.C. § 3237(a).

If the book had been submitted to the jury, and if the jury had acquitted defendant Aday on the count naming the book, *The Black Night*, it would still be impossible to know whether or not the jury based its acquittal upon the fact of non-obscenity. It is as reasonable to assume that they may have acquitted defendant Aday on grounds of lack of *scienter*, or non-transportation.

■ Defendants' claim here, erroneous in the premise, is no more than a repetition of their theory that it is the books which are on trial, and not the defendants. However, as Chief Justice Warren said in Roth, supra:

"It is not the book that is on trial; it is a person. The conduct of the defendant is the central issue, not the obscenity of a book or picture. The nature of the materials is, of course, relevant as an attribute of the defendant's conduct, but the materials are thus placed in context from which they draw color and character. A wholly different result might be reached in a different setting."

■ In fact, the statutes involved in this case contemplate that a defendant may be acquitted for sending a book to one place, and found guilty for sending the same book to another place. Footnote 30 to the majority's opinion in the Roth case, supra, stated:

"It is argued that because juries may reach different conclusions as to the same material, the statutes must be held to be insufficiently precise to satisfy due process requirements. But, it is common experience that different juries may reach different results under any criminal statute. That is one of the consequences

---

14. In the case of United States v. Sanford Aday, D.C., N.D.Cal., # 3545, Fresno, 1958, the pertinent proceedings relating to this issue were set out in the Government's proposed exhibits 1000 F., G. and H. These exhibits show that *The Black Night* was not considered by the jury. Defendants' proffered exhibit FFFF is incomplete as regards this issue.

we accept under our jury system. Cf. Dunlop v. United States, 165 U.S. 486, 499–500 [17 S.Ct. 375, 379–380, 41 L.Ed. 799]."

It became apparent to the court during the course of the trial, in light of the above facts and law, that defendants had one purpose only in persisting on using the Fresno case material—that was to confuse the jury on matters of law to such an extent that they would believe the claimed acquittal of the books in the Fresno case *ipso facto* demanded an acquittal of the books in the present case.

Defendants' counsel was relentless in trying to state to the jury that one of the books here challenged was acquitted by another jury. When pressed on this issue, counsel digressed, then glossed over the issue, then finally admitted that no book in this case was presented to the jury for its consideration in its final deliberations in the Fresno case.

The same purpose was pursued in defendants' insistence that the blurbs in the challenged books go to the jury. After the Fresno trial experience, defendants anticipated certain defenses and took steps to build these defenses or traps into their publications.

The defendants drafted blurbs and placed them in their books.[15] When the

---

15. In a copy of Witch Finder before the court, the following appeared:

"JURY VOTES FOR FABIAN AND SABER BOOKS"

In April, 1958 the Government charged that* eleven books published by FABIAN and SABER BOOKS went substantially beyond contemporary community standards and appealed to the prurient interests of an average normal person. Before trial, the Government dismissed its case as to eight of the books and the case went to the jury as to the remaining three. After a three week trial, and after considering the case for some sixteen hours, the jury acquitted as to the book Rambling Maids and voted nine to three in favor of The Strange Three and Turbulent Daughters.

We are, of course, pleased with the outcome since we always felt that our books were within contemporary community standards. We would appreciate hearing from you advising us what you think of our books. We are particularly anxious to know if in your opinion any of our books deal too intimately with sex and whether you believe that they should be available to the average, normal person. Please address your communications to:

FABIAN BOOKS, LTD.
2919 East Belmont Avenue
Fresno 1, California

"CENSORS DON'T PROTECT MORALS

Editor The Herald: As a student of literature (on both the graduate and undergraduate levels) I was revolted to read the article on John S. Sumner in The Herald July 5. This man brags and chuckles about the way he persecuted Theodore Dreiser, James Branch Cabell, and other of America's greatest writers. The damage this man has done to American literature is incalculable.

As a citizen I rankle at his attack on our Supreme Court, which has upheld our Constitution in guaranteeing freedom of the press. All censorship, whether originating in courts, the Post Office Department, or volunteer citizen 'pressure groups,' is undemocratic and unconstitutional. Thank the Lord that we do have the Supreme Court to protect our four freedoms!

As the father of two wonderful children and head of a Christian home, I am aghast at the idea that this man justifies his life's work on the grounds that he is protecting my children. If you would protect my children, Mr. Sumner, protect them from the intolerance, injustice, and bigotry which permit censorship and suppression of literature. Protect them from tyranny and thought control. Protect them from any movement which would in any way diminish their freedoms of speech, press, religion, and free assembly guaranteed by our Constitution.

Do not worry about their morals, Mr. Sumner. Leave that to me, their mother, their church, and their consciences. No book has ever been written, no photograph ever taken, no movie ever produced, which can 'corrupt' my children, me, or anyone else, for that matter, in the slightest degree.

The greatest Book ever written, which my family reads daily, says, in Romans XIV: 'I know and am persuaded by the

---

* The eight titles dropped in the original Government charge are: FABIAN: Rene, Black Night, Stairways to Sin, Dark Quarters, Tainted Wife, Violent Surrender, Taxi Dancers. SABER: Karla."

books were presented to the jury, the court was faced with a well-planned dilemma: should the court submit such misleading self-serving statements to the jury on the theory that they are a part of the books as a whole; or should the court risk error by removing them from the books? The court resolved the doubt in favor of defendants and allowed the books, including the blurbs, to go to the jury.

■ However, in light of the total plan of defendants in this case, which was apparent after all the evidence was in, the better rule would have been to remove these blurbs, since reason commands that the book as a whole consists of the story from page one to the end. The blurbs are unrelated, prejudicial, improper, misleading, and should be removed.

To do otherwise is to serve the perverted objectives of the defendants. It places before the jury excerpts and parts of other works taken out of context for comparison purposes, and it gets before the jury defendants' interpretation of the works in printed form as exhibits which may be taken into the jury room during the jury's deliberations. Such techniques are designed, first, to circumvent the requirement of the Roth rule, which is to consider "material as a whole", and, secondly, to dilute or defeat

the rule which requires the jury to take the law as given to them by the Judge, and from no other source.

## 4. EXPERT WITNESSES.[16]

The court's opinion filed during the course of the trial on the use of expert witnesses in this case follows.

At a pretrial conference held in this cause on October 23, 1963, this court in commenting upon the use of expert witnesses, ruled that if expert witnesses were allowed, they would be limited in number to two on each side. At a continuation of that conference on October 28, 1963, the defendants represented to the court that they had four expert witnesses whom they sought to use.

The court's final ruling on the use of expert witnesses and the law relating to such issue are contained in this opinion.

It is clear to the court, and indeed does not appear to be contested by the parties, that no expert testimony will be allowed as to any ultimate issues involved in this case.

■ The general rule relating to expert testimony applied to this case demands that there be no expert testimony on the issue of "obscenity," "appeal to prurient interest," and "dominant theme"—with perhaps some minor qualification as to dominant theme, which will be gone into later in this opinion. United

Lord Jesus that there is nothing unclean of itself, but to him that esteemeth anything to be unclean, to him it is unclean.'

I am most positive that it would be better for any crusader against books to spend his energy cleansing his own mind of the idea that sex and references to it are unclean.

Sex is a vital part of life and should be thoroughly explored in all its aspects, both good and bad, by our writers. Since it is ten per cent biology and ten per cent sociology, there should be scientific and technical books on the subject. And since it is eighty per cent emotional in nature, our poets, novelists, and dramatists should continue making it their most popular theme.

Long live sex, literature, and freedom, in spite of all their enemies!

WILLIAM R. BRANTLEY"

In addition, the pubishers saw fit to include a letter written by the author in answer to an anonymous letter supposedly received by the author, in which he refers to: Peyton Place, A Certain Smile, Lady Chatterly's Lover, Pornography and the Law (by Drs. Eberhard and Phyllis Kronhausen—stressing this quote: "AND I THINK ANTI-PORNOGRAPHY AND ANTI-OBSCENITY LAWS DO A LOT OF DAMAGE"); God's Little Acre, Pilgrim's Progress; Studies in the Psychology of Sex, by Havelock Ellis; The Bible ("The Bible would be the first to go. * * * It is one million times sexier than Peyton Place."); Tom Sawyer, Huckleberry Finn. The letter is nothing but a prejudicial final argument for a cause not supported by the present law of obscenity.

16. Motion for new trial, paragraph 8.

States v. Spaulding, 293 U.S. 498, 55 S.Ct. 273, 79 L.Ed. 617; Farris v. Interstate Circuit, 116 F.2d 409 (CCA 5, 1941); United States v. Sauls, 65 F.2d 886 (CCA 4, 1933); Coca-Cola Co. v. Joseph C. Wirthman, 48 F.2d 743 (CCA 8, 1931); and Standard Fire Extinguisher Co. v. Heltman, 194 F. 400 (CCA 6, 1912).[17]

■ The Government, on page 32 of its trial brief, concedes that expert testimony as to the literary value of the challenged books is admissible.

Therefore, in accordance with the defendants' memorandum on their witnesses, the only question remaining is whether or not expert witnesses may be used to testify as to "contemporary community standards."

The cases which have discussed the issue of expert witnesses in obscenity cases present at best a dim beacon for the court's guidance. It may well be that the opinion of Judge Learned Hand in United States v. Levine, 83 F.2d 156 (CCA 2, 1936), will ultimately be recognized as the proper statement of the functions of the jury in an obscenity case. The determination of all the issues in an obscenity case is properly for the jury according to Judge Hand. In his opinion, he says:

"As so often happens, the problem is to find a passable compromise between opposing interests, whose relative importance, *like that of all social or personal values, is incommensurable. We impose such a duty upon a jury (omitting citation), because the standard they fix is likely to be an acceptable mesne, and because in such matters a mesne most nearly satisfies the moral demands of the community.* There can never be constitutive principles for such judgments, or indeed more than cautions to avoid the personal aberrations of the jurors." (Emphasis supplied.)

Judge Hand recognized, however, that certain factors must be taken into con-

sideration when the book is weighed by the jury:

"* * * if it is old, its accepted place in the arts must be regarded; if new, the opinions of competent critics in published reviews or the like may be considered; what counts is its effect, not upon any particular class, but upon all those whom it is likely to reach."

The demands of the terms of the statute alone led Judge Hand to the conclusion that the jury in an obscenity case plays a very distinct role.

"Thus 'obscenity' is a function of many variables, and the verdict of the jury is not the conclusion of a syllogism of which they are to find only the minor premise, but really a small bit of legislation ad hoc, like the standard of care."

In support of the interpretation that Judge Hand's opinion was intended to be a finding that the elements of an obscenity case are peculiarly for the jury, at the close of his opinion he made the following remarks:

"On the other hand it is reasonable to allow in evidence published reviews of qualified critics—*quite another thing incidentally from expert witnesses at the trial—for such evidence does not lead far afield and is rationally helpful,* though in the end it is the jury who must declare what the standard shall be." (Emphasis supplied.)

In a customs case shortly after United States v. Levine, supra, Parmelee v. United States, 72 App.D.C. 203, 113 F. 2d 729 (D.C.1940), the court felt that contemporary community standards, or the limits of candor, could best be established with the aid of expert opinion.[18] The court said:

"But when we attempt to locate that critical point in the situation of the present case, we find nothing

17. The Government's brief clearly and correctly summarizes the general rules relating to the use of expert testimony and those cases need not be gone into in detail at this time. See Government's Trial Brief, Pages 17 to 22.

18. In the court's opinion the phrase "customary limits of candor," coined from

in the record to guide us except the book itself. The question is a difficult one, as to which the expert opinions of psychologists and sociologists would seem to be helpful if not necessary."

It must be noted, however, that contrary to the Levine case, supra, the Parmelee case was not tried before a jury, but turned on the decisions of a customs official.

There may be a particular need for such testimony to act as a safeguard in cases where a single individual is charged with the duty of determining obscenity. It is difficult to see how expert testimony can help the jury in arriving at a determination of the morals of the community.

Justice Stewart (then Judge) for the Court of Appeals for the Sixth Circuit, in Volanski v. United States, 246 F.2d 842, 1957, ruled that the admission of expert testimony under particular circumstances was error.

In that case a psychologist had been allowed to state his opinion as to the effects of the indicted material upon juveniles. The court's ruling in regard to the error committed in such an admission relates generally to the fact that the test is no longer limited to a particular group, such as juveniles. The opinion, however, is important for other reasons.

Justice Stewart then quoted extensively from United States v. Levine, supra, to the same effect as this court has in its opinion above. The Volanski case adopted with approval the position that the jury is the most acceptable mesne and that it is the jury which most nearly satisfies the moral demands of a community.

Judge Prettyman in Womack v. United States, 111 U.S.App.D.C. 8, 294 F.2d 204 (D.C.C., 1961) had occasion to comment upon this same issue. Without analyzing the difficulties that exist in the issue of expert witnesses, Judge Prettyman assumed they could be used, but went on

to find that they had not been properly qualified. He stated in his opinion as follows:

"Appellant called as witnesses two psychiatrists and two sociologists and sought to have them testify as to the contemporary community standard, but they failed to qualify as experts on the subject *and the court refused to allow them to express opinions on the subject*. Obviously the trial judge was correct upon the point. To be permitted to express an opinion as an expert, a witness must first qualify as an expert on the subject at issue. There was no showing or proffer to show that these witnesses did in fact know or had reliable means of learning what those standards were." (Emphasis supplied.)

This points up the difficulty in securing an "expert" on contemporary community standards, or the limits of candor, in the community, or the morals of a community.

The latest federal decision outside the Supreme Court which had before it this issue was Kahm v. United States, 300 F. 2d 78 (CCA 5, 1962). The question was raised when defendant complained that the Government had not called any expert witnesses in the presentation of its main case. That court ruled, as this court has already ruled, that there was no requirement for the Government to do so.

The court in Kahm went on to discuss the opinion in Smith v. People of State of California, 361 U.S. 147, at pages 160 and 161, 80 S.Ct. 215, 4 L.Ed.2d 205, where Mr. Justice Frankfurter dwelt considerably upon the need for expert witnesses in these cases.

However, the Kahm court was not persuaded by Justice Frankfurter, since in dictum the court said:

"We think it may fairly be said that no amount of testimony by anthropologists, sociologists, psychia-

Judge Hand's opinion in United States v. Kennerly, 209 F. 119 (D.C.S.D.N.Y., 1913) was used interchangeably with contemporary community standards.

trists or psychologists *could add much to the ability of the jury to apply those tests of obscenity to the materials here present.*" (Emphasis supplied.)

The Federal District Courts have had fewer occasions to comment extensively upon this issue. In United States v. Two Obscene Books, 92 F.Supp. 934 (D.C.N.D. Calif., 1950), the issue arose when the claimant in a libel action motioned for a commission to take the depositions of nineteen persons alleged to be experts in the field of literary criticism. The experts were to be asked questions relating to their representative opinions of the two books involved from the standpoint of value as works of literature. The court said:

"There is no direct authority for the proposition asserted by claimant that the estimates or criticism of so-called literary experts are relevant in a proceeding under 19 U.S.C.A. § 1305. True, there is reference in United States v. One Book entitled 'Ulysses,' supra [2 Cir., 72 F.2d 705], and in United States v. Levine, 2 Cir., 83 F.2d 156, to evidence of the opinions of qualified critics. These statements, however, were purely dicta, as in both cases all that was ever submitted to the lower court or before the higher court were the books themselves.

"*Obscenity is a question of fact which can be determined by the court or the jury by reading the books. Salacious or filthy literature or pictures cannot become clean and wholesome upon the mere statement of some alleged or so-called critic.*

"In my opinion, the issuance of a commission or the taking of the depositions of the 19 persons named in claimant's motion is unnecessary and unwarranted. *Such testimony as might thereby be elicited is wholly irrelevant and immaterial.*" (Emphasis supplied.)

The attack upon the rule advocated by Judge Hand in the Levine case, supra, was sidestepped by the parties in United States v. 4200 Copies International Journal, 134 F.Supp. 490 (D.C.E.D.Wash., 1955), where the experts who were used in that case were four "non-experts". The defendant called two women, one a mother and the other a grandmother, who certainly are not considered to be experts in the sense presently before this court, but who were, however, both members of a nudist organization; and they testified that there was nothing objectionable in the challenged material.

On the other hand, the Government introduced two average housewives, "representative of the average person of the community," and they found that the publications were indecent and obscene. The use of this type of expert is more consistent with the statement of Judge Hand in the Levine case, supra; but, query: how much does this "aid" the jury?

The court in Upham v. Dill, 195 F. Supp. 5 (D.C.S.D.N.Y.), quoting Judge Moore in Grove Press, Inc. v. Christenberry, 276 F.2d 433 (CCA 2, 1960), specifically set out the dilemma raised by comparing the Levine position with the position in Parmelee. For example:

"Both the 'average man' and 'contemporary community standards' are factors in the formula we are directed to apply. Individual judges should hesitate to speak for the 'average man' and hesitate to define 'contemporary community standards.' *The ideal solution to the problem, in our judgment is a jury trial.* What better way can this book be tested than by the unanimous opinion of twelve jurors selected at random from a large metropolitan community. In such a way the plaintiff will not have to be relegated to the opinion of a single judge who would have difficulty determining what the 'average man' would think, and what 'contemporary community standards' are. It also would provide a forum for plaintiff's expert *literary* critics to voice their opinions and for the govern-

ment to call theirs. Such procedure is the closest approach to, or approximation of the 'average man.' The experience and observations of twelve jurors picked at random will come closer to an appraisal and understanding of 'contemporary community standards.'" (Emphasis supplied.)

Some of the state courts have treated more extensively the use of expert witnesses than the federal courts. The opinions do not help, however, in resolving some of the difficulties involved in the use of expert witnesses, but generally there is a statement only that expert witnesses are allowable, or they are proper.

In Commonwealth v. Isenstadt, 318 Mass. 543, 62 N.E.2d 840 (Mass.1945), the Supreme Court of Massachusetts found that exclusion of expert testimony was not error. The court said:

"The principal matter about which expert opinion was sought was nothing more than the reaction of normal human beings to a kind of stimulation which is well within the experience of all mankind. Since the inquiry relates to the probable effect upon the general public who may read the book, there is reason to believe that a jury being composed of men drawn from the various segments of that public, would be as *good a judge of the effect as experts in literature or psychiatry, whose points of view and mental reactions in such matters are likely to be entirely different from those of the general public.*" (Emphasis supplied.)

The present status of the law in the State of Massachusetts is not clear in the light of Attorney General v. The Book Named "Tropic of Cancer", 345 Mass. 11, 184 N.E.2d 328 (1962), where the court recognized the significance of expert testimony on the issue of literary value.

The finding of the Maryland state court in the case of Yudkin v. State, 229 Md. 223, 182 A.2d 798, that refusal of expert testimony required reversal was based upon the statement of Justice Frankfurter in Smith v. People of State of California, supra, and the value of the Yudkin case therefore stands or falls with the persuasiveness of Justice Frankfurter.

That the difficulties subordinate to the issue of the use of expert witnesses have not been resolved is attested by the discussion of Professor Kalven in his article, "The Metaphysics of the Law of Obscenity," Minnesota Law Review, 1960, University of Chicago Press.

Professor Kalven recognizes that expert testimony relating to the literary value of a work is undoubtedly helpful, but he points out, and this court so recognizes in this case, that the court often knows the literary value, or the lack thereof, of a particular work.

The real problem comes when you try to use expert testimony to show the prevailing moral standards of the community. As to that use, it is not at all clear what expertise is available.

Professor Kalven finally concludes that perhaps the only experts on the issue at hand are the jury, as Judge Hand pointed out in United States v. Levine, supra, and further states that it is possible that the logic of Justice Frankfurter leads to the same conclusion.

In his book, "Censorship; Government and Obscenity," at Page 211, Father Terrance Murphy adds an additional twist to the difficulties faced in this case. He states:

"Community standards are tied to the average person and *prevalent literary critics are not representative of the average reader.* Information on the reading habits of the community would be more reliability (sic.) by obtaining from distributors than from literary critics." (Emphasis supplied.)

This position apparently overlooks the fact that throughout history a great number of books which were held to be obscene sold in great numbers and it is

impossible to determine, as Judge Hand pointed out in United States v. Levine, supra, what it is that caused each buyer to buy.

The court is faced with decisions which hold that the jury alone determines the "contemporary community standards"; that experts are "helpful or necessary"; or that experts are required as a matter of law.

As the court pointed out at the beginning of this opinion, it may be that after a period of experience in the courts with the unresolvable difficulties on the issue of expert testimony in this regard, that the opinion of Judge Hand in the Levine case, supra, may ultimately prevail.

Strongly bearing upon the use of experts in this case are the books themselves. The court has read each book in its entirety. These books are produced solely for "commercial exploitation." Roth v. United States, 354 U.S. 476, 496, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (Chief Justice Warren concurring). The single purpose of these books is to nourish the erotic fantasies of those into whose hands they fall. It is difficult to see any "social redeeming value" (see Roth, supra) in these books unless one unrealistically maintains that there is a value in an appeal solely to eroticism.

Sex is here portrayed in multitudinous forms, with great variety and vigor. The nature of the sexual acts described and the circumstances surrounding them graphically and autoptically emphasize the obscenity of the books.

The intensive,[19] unrealistic, insulting portrayal of sex in these books compels the court to conclude in its own mind that there is more than a probability that any jury could find these books obscene—and if it were an issue, could find them to be hard-core pornography.[20]

These books themselves are before the jury and may reasonably be said to be the sole relevant evidence of their obscenity or non-obscenity. United States v. Two Obscene Books, supra; United States v. One Book entitled "Ulysses," supra; United States v. Levine, supra; Kahm v. United States, supra; and Womack v. United States, supra.

If the court were to hold now that the books are so self-evident in their obscenity that the jury does not need the aid of experts, the court would not be without authority.

In Womack v. United States, supra, the court made this observation:

"If a piece of cloth is bright red, and the cloth itself is in evidence, no testimony, lay or expert, would be admissible to show the cloth is blue. *Such testimony would be immaterial, of no probative value, upon the issue of the color. Its admission would be a waste of the court's time, confusing, prolonging, and tending to make a mockery of the processes of justice.* * * * In the case at bar the photographs were filthy,

---

19. The numerous portrayals of sex are here set out in books that range in length from 119 to 154 pages. There is evidence that the company policy restricts the length of the books to not more than 160 pages. It then becomes a race to work in as many sexual episodes as possible within that rather short length.

20. The Government's brief in the Roth case as it appeared before the Supreme Court, at Pages 35–38, divided "the commercial obscene material which is made non-mailable by Section 1461" into three categories.
The first category was comprised of those "novels of apparently serious literary in-

tent sometimes skillfully written." An example of a novel in this category is, according to the Government, "Tropic of Cancer." The books challenged in this case are not in that first category.
The second category consists of "borderline entertainment area." Only a few, if any, of the books in this case may possibly fall into the lower end of the range of the works in this category.
The third category is composed of "hard-core pornography." The majority of the books challenged in this case most likely fall within this category.
See further discussion on Page 198 of this opinion.

self-evidently and indisputably. We think that photographs can be so obscene—it is conceivably possible that they be so obscene—that the fact is incontrovertible." (Emphasis supplied.)

The court in the Kahm case recognized the dissent of Justice Frankfurter in the Smith case. It is reasonable interpretation to find that the Kahm case is authority for the fact that Justice Frankfurter's position is inapplicable in a case where obscenity of the books is self-evident.

There is opportunity then for a judge to rule that the nature of the books forecloses the use of expert witnesses. See Commonwealth v. Isenstadt, supra (headnote 20); Kahm v. United States, supra; and Womack v. United States, supra.

Justice Frankfurter in the Smith case becomes the pivotal authority for the defendants; but even Justice Frankfurter did not make an attack on the duty of the jury as Judge Hand viewed it. In the appellant's jurisdictional statement in the Smith case, Page 30–31, the following proposition was before the court:

"Apparently, the court below assumed that the trial judge was the 'community,' and, as such, alone equipped to determine the 'appeal to prurient interest' of the writing. But, this view essentially erases the factual issues, and turns the question of obscenity to be decided by the court, or by the jury, into a matter of *ad hoc* legislation only."

The fact that this was not faced by any of the Justices when the opportunity was presented, particularly Justice Frankfurter, weakens the authority of that case as support for defendants' contention in this case.

Justice Brennan, who wrote the majority opinion in the Roth case, supra, sharpens the concept of jury duty in obscenity cases in his dissent in Kingsley Books, Inc. v. Brown, 354 U.S. 436, 77 S.Ct. 1325, 1 L.Ed.2d 1469 (1957). He said:

"The jury represents a cross-section of the community and has a special aptitude for reflecting the view of the average person. *Jury trial of obscenity therefore provides a peculiarly competent application of the standard for judging obscenity which, by its definition, calls for an appraisal of material according to the average person's application of contemporary community standards.* A statute which does not afford the defendant, of right, a jury determination of obscenity falls short, in my view, of giving proper effect to the standard fashioned as the necessary safeguard demanded by the freedoms of speech and press." At Page 448 of 354 U.S., at page 1331 of 77 S.Ct., 1 L.Ed.2d 1498. (Emphasis supplied.)

Justice Brennan gives weight to the opinions in the various cases involving non-jury trials where experts were felt to be necessary. Compare Parmelee v. United States, supra.

It is mainly in deference to the opinion of Justice Frankfurter in the Smith case, supra, and by implication of the opinion of Justice Harlan in the Smith case, supra, and as a matter of grace, that the court in this case is going to allow the use of expert testimony. As the court has pointed out, such use will be related to testimony concerning the literary worth of the challenged books and the contemporary community standards.

The court will not relax the fundamental requirements of evidence. This court will insist, as the trial judge did in the Womack case, supra, that the experts used in this case be qualified to testify in the areas of their claimed expertise. The facts upon which an expert in this case bases his opinion must be clearly established. The foundation for any expert testimony must be laid in such a manner as to satisfy the court that the expert is an expert in either of these two areas.

If any of the expert witnesses has been permitted to testify upon qualifica-

tion, the court intends at the conclusion of the case to give a clear and specific charge relating to the value of expert testimony and the reliance of the jury upon that testimony.

As pointed out hereinafter on the use of other books for comparison, to aid the jury in establishing contemporary community standards, the witnesses used in the comparison are required, as part of the foundation, to convince the court that the book compared is reasonably identical to any of the challenged books.

This may raise questions relating to the basic facts behind the dominant theme of the books used for comparison, but it does not raise a question as to the dominant theme of any of the challenged books, and the testimony of a witness in that regard is only for the purpose of laying the foundation for the admission of his testimony. It does not mean that the expert can testify as to what he thinks is the dominant theme of the challenged books. The dominant theme of the challenged books is an ultimate issue of fact for the jury, and they are to decide that without the aid of expert testimony. Only the facts may be referred to in comparison.

In accordance with this court's opinion, expert testimony will only be allowed on two issues—literary value and contemporary community standards.

In order to prevent unnecessary cumulative expert testimony after considering the nature of the expert sought to be used, as stated by the defendants in their memorandum, the court will permit the use of three expert witnesses by each side.

This is the end of the memorandum opinion on the use of expert witnesses as written by the court during the course of the trial.

It is to be noted the parties were advised early, before and during the trial, as to the number of expert witnesses the court would permit each side to use.

Defendants insisted on presenting a fourth alleged expert witness, Dr. Martha Boaz. According to the defendants, this expert was crucial to their case because of her specialized knowledge.

In limiting the parties to the use of three expert witnesses the court did not choose which three persons were to be used as witnesses. Defendants chose to call three expert witnesses other than Dr. Boaz. All three of these experts testified to substantially identical facts.

A scanning of the testimony of defendants' experts, clearly demonstrates, that after defendants' witness Robert Kirsch testified, the testimony of witnesses Edward L. Galligan and Guy Endore was grossly cumulative.

Their "best prepared" expert witness, in the words of defendants' counsel, Mr. Fleishman, "world renowned" author Guy Endore, added nothing new to the testimony of Kirsch.

Defendants' counsel could have called Dr. Boaz as one of their three expert witnesses. The choice was his to make. He elected not to call Dr. Boaz.

The problem of expert witnesses on contemporary community standards is new and relatively undeveloped. After a minimal inquiry into the qualifications of the experts offered by defendants in this case, the court again resolved all doubts in favor of defendants and permitted these witnesses to testify before the jury on contemporary community standards.

The experience of the court in this trial throws considerable light upon the complete problem. The position of defendants and their experts became clear at the conclusion of their testimony. Witness Galligan, for example, testified that he was opposed to *any* obscenity laws which were directed at material both patently offensive and which appealed to prurient interest. He stated he would substitute the "clear and present danger" test.

This position is contrary to the rule of law as declared by the United States Supreme Court in the Roth and the Albert cases. It was a studied attempt to put before the jury expertise on what the law *should* be and not what the law *is*.

Once erroneous impressions are implanted in the minds of the jury and then cultivated by repetition, prejudicial consequences may result, which may not be removed by the judge's instructions to the jury. This may especially be the case where incorrect, or out-of-context interpretations of law, are printed as blurbs in books which are also exhibits in the case; or when presented to the jury in the form of cumulative allegedly expert testimony, but which are in fact fallacious propositions of law, or standards, as the alleged experts desire them to be.

In this case, by giving defendants more protection than they were entitled to under the law, the jury heard *advocates* and not *experts*. These advocates attempt to make straight the way for the free flow of obscenity.

Witness Kirsch was an advocate of his special interests as an editor of the books section for the Los Angeles Times. According to his testimony, as a book reviewer he sets the pace for his paper's readers. He is also an author and a professor. He testified he had never made a study of contemporary community standards, but said they were a necessary part of his work as a literary critic. He admitted that he never reviewed the challenged books, but he had no difficulty in asserting that they were within contemporary community standards. His opinion was clearly influenced by his personal, academic, economic and philosophical interests.

Author Guy Endore is clearly an advocate of unlimited license to write, publish, and distribute in disregard of obscenity laws. He testified that he is now writing a book which may test the limits of the obscenity laws. Such an "expert" could hardly be expected to objectively approach contemporary community standards in any way except one favorable to his own position.

At the conclusion of all the expert testimony, it was clear that without laying a better foundation as to the qualifications of witnesses, experts on contemporary community standards are too easily

what one wishes them to be. If no more is required than that the proffered witnesses have certain experiences in the literary field, it becomes only a question of finding the experts with a philosophy favorable to the cause of the party offering the witnesses.

The testimony of the experts in this case truly did not reflect the standards of the community; their testimony may reflect the standards of certain professors, book reviewers, and types of authors, with particular ideas about unlimited license to write, publish and distribute material in the area of obscenity. The contemporary standards of the community, however, must be found elsewhere.

Thus, the battle of experts becomes the battle of ardent advocates for their chosen causes; their positions are multiple final arguments rather than factual expert opinion in a proper evidentiary sense.

In the last analysis, it is historically clear that the common conscience of the community, at any given time, is best expressed by the accepted fact finding institution, the jury. Again, as Judge Learned Hand expressed it, the jury executes a bit of *ad hoc* legislation.

The use of expert testimony and comparative material is circumscribed by the requirement of the Roth rule that the "dominant theme of the material, *taken as a whole*, appeals to the prurient interest."

To clearly and fairly apply this rule, both challenged material and comparable material must be considered *as a whole*. Thus, the practical limits of a trial impose the necessity to restrict the scope of the jury's inquiry into comparable material, so that the jury may be able to consider each book as a whole, of all material in evidence.

The court considered this problem and before it resolved the guidelines for presentation of expert testimony and comparable material, ordered that neither of the parties mention the names of any other material in the presence of the jury until the court resolved the

method by which comparable material should be presented to the jury.

## 5. COMPARATIVE EVIDENCE.[21]

The court's opinion delivered during the course of the trial on the use of comparison books is here set out in full.

One of the most difficult questions presented in this case is whether or not books of an allegedly similar nature to those challenged, and generally available on the market, may be introduced into evidence.

Defendants seek to have this evidence introduced in support of their claim that the challenged books do not go beyond the customary limits of candor.

The court is convinced that certain types of books can be eliminated from consideration as a matter of law, in that they are not in any way, shape or form similar to the books challenged in this case. This group of books is composed of the following non-exclusive descriptions: medical treatises; medical text books of any nature; scientific treatises or text books of supplementary material in the area of sociology, psychiatry and psychology; books dealing in a technical way with marriage and the family, and sexual relations; works recognized as "classics" or of an undeniable literary value; and magazines.

▮ It is readily apparent that due to the test which must be applied in these cases, books of the nature listed above cannot reasonably be said to be similar in any way to the books challenged in this case. The test is that the challenged books must be considered as a whole. The court has read the books under challenge in this case. As a matter of law, the court finds no difficulty in separating the books involved in this case from the books above described according to the nature of the work.[22] See United States v. Roth, 237 F.2d 796, 819–820 (CCA 2, 1956).

The more difficult issue for the court to determine is whether any books allegedly similar or not may be introduced as evidence in this case on the issue of contemporary community standards.

The reasoning applied by the courts which have previously faced this difficulty has been varied. In Burton v. United States, 142 F. 57 (CCA 8, 1906), the defendants sought to introduce evidence that the book challenged was not obscene, and to support their position claimed that portions of the challenged text were extracts from standard medical works. The trial court excluded the evidence and it was affirmed on appeal. The court through Judge (later Justice) Van Devanter, said:

"The book itself was in evidence. It was not a communication from a doctor to his patient, nor a work designed for the use of medical practitioners only. There was no dispute as to its contents, nor was there any difficulty in understanding the acts described and the ideas conveyed. If these were calculated to deprave the morals of the reader by exciting sensual desires and libidinous thoughts, the book was obscene, even though each of the matters sought to be shown was

21. Motion for new trial: ¶ 9, 10, 11, 12, 14 (a)–(j), 15, 17.

22. A collection of cases making a similar comparison may be found in: United States v. Thirty-One Photographs, 156 F.Supp. 350 (D.C.S.D.N.Y., 1957). In that case may be found cases dealing with: Scientific and medical publications: Commonwealth v. Landis, Q.S.1870, 8 Phila., Pa., 453; United States v. Chesman, C.C.E.D.Mo., 1881, 19 F. 497; United States v. Smith, D.C.E.D.Wisc., 1891, 45 F. 476; Books for married couples: Burton v. United States, 142 F. 57, 63 (CCA 8, 1906); Archaeological matter: United States v. One Unbound Volume, D.C.D.Md., 1955, 128 F.Supp. 280; United States v. One Package, 86 F.2d 737 (CCA 2, 1936); United States v. Nicholas, 97 F.2d 510 (CCA 2, 1938); Davis v. United States, 62 F.2d 473 (CCA 6, 1933). Psychology: United States v. Rebhuhn, 109 F.2d 512 (CCA 2, 1940).

true." (Omitting authorities.) (At page 63 of 142 F.)

A problem involving similar considerations faced the court in United States v. Levine, 83 F.2d 156 (CCA 2, 1936). The jury in that case found three matters to be obscene, two of them being books. The trial judge refused to allow in evidence a list of purchasers of the books, even though the list contained the names of well known persons. Judge Learned Hand affirmed, saying:

"Such a list taken alone told nothing of the standing of the works in the minds of the community; even respectable persons may have a taste for salacity. Obviously it would be impossible without hopelessly confusing the issues to undertake any analysis of such a list by finding out why each buyer bought."

Judge Hand's hesitation is similar to that of courts in later decisions which point out the existence of a book on a stand may show no more than that they have not yet been challenged in a proper court proceeding.

In United States v. Rebhuhn, 109 F.2d 512 (CCA 2, 1940), the trial judge had refused to allow in evidence a copy of a certain book. However, that book was introduced solely to show the standing of the authors in relation to the excerpts defendants had taken from their works. The reputation of the authors was found to be immaterial, however, since the defendants had abusively used the excerpts. This issue is quite separate from that of contemporary community standards.

The issue of similar items appeared in the case of United States v. Oakley, 290 F.2d 517, 519 (CCA 6, 1961), in connection with the motives of the defendant. The observation of the court, however, is pertinent to the situation in this case. The case concerned photographs. Judge O'Sullivan, speaking for the court, said:

"Defendant told of pictures seen by him while in the service. He introduced numerous publications and made reference to other media of information and entertainment currently available to the view of the public. He argues that his material was no worse than these. From his experience with these matters, he was persuaded, he says, that his enterprise was not illegal, and criminal intent was absent. We need not here pass upon the relative merits, or demerits, of defendant's wares and what may be obtained elsewhere. *We decline to hold that contemporary sophistication has reached a point whereby to provide this defendant, or anyone else, with a license to prosecute the business of disseminating obscenity. It was for the jury here, under proper instructions and applying 'contemporary community standards' in the context of defendant's conduct, to determine his guilt."* (Emphasis supplied.)

Judge O'Sullivan's opinion raises a grave hurdle in considering this issue. By allowing the use of allegedly similar books to show contemporary community standards in this case, would we not be granting license to all persons to disseminate material which compares to that on the market before the material on the market has been adjudged obscene or not?

A case dealing more extensively with this issue was Womack v. United States, 111 U.S.App.D.C. 8, 294 F.2d 204 (D.C.C., 1961). On this issue the court's reasoning can best be set out in full:

"[3, 4] The trial judge denied admission into evidence of dozens of books and magazines which contained nudes and which are regularly sold in ordinary commerce. We think he correctly did so. The proffered evidence was immaterial, i. e., of no probative weight in reaching a decision upon the issue at trial. The fact that nudes by Manet, Titian, Raphael, Rembrandt, Picasso, and many others are accepted commercial items is of no possible probative value in deciding whether these particular photographs, which alone are in issue here, are obscene

and filthy. If a piece of cloth is bright red, and the cloth itself is in evidence, no testimony, lay or expert, would be admissible to show the cloth is blue. Such testimony would be immaterial, of no probative value, upon the issue of the color. *Its admission would be a waste of the court's time, confusing, prolonging, and tending to make a mockery of the processes of justice. Mr. Wigmore treats of this topic in his discussion of relevancy, positing that one of the elements of relevancy is that the proffered evidence have something more than a minimum of probative value. Whether academically we call the principle materiality or relevancy, it is settled that to be admissible a bit of evidence must have some potential probative weight upon the issue of fact under trial.* In the case at bar the photographs were filthy, self-evidently and indisputably. We think that photographs can be so obscene —it is conceivably possible that they be so obscene—that the fact is incontrovertible. These photographs are such.

"Apart from the foregoing, dispositive of the point is the fact that Womack made no attempt to show, as a foundation for his proffer, any resemblance between the proffered works of art and the photographs he was putting in the mail. *The predicate for a conclusion that a disputed piece of mailed matter is acceptable under contemporary community standards, as shown by proffered other matter already in unquestioned circulation, must be that the two types of matter are similar. And as another part of his foundation he must show a reasonable degree of community acceptance of works like his own.* The impossibility of such showing was fatal to the substance of Womack's case, and his failure to attempt it was a procedural fatality." (Emphasis supplied.)

Judge Prettyman has advocated that a court first decide whether or not the material indicted is obscene *per se*. He would then find comparative testimony immaterial.

The second important factor in Judge Prettyman's opinion is relevant to this case. The proper foundation must be laid to show the similarity between the offered books and the challenged books. Without setting out what a proper foundation would be, Judge Prettyman does hold that part of a proper foundation is a showing of reasonable degree of community acceptance of works like those challenged.

The latest federal decision dealing with the issue is Kahm v. United States, 300 F.2d 78 (CCA 5, 1962). However, that case merely recited that the defendant was allowed to introduce into evidence a Kinsey report and a substantial number of publications and magazines for the purpose of demonstrating how his material was no worse than many other writings available to the public. It appears from the context of the court's decision that the introduction of such evidence was permissible under the rulings in Smith v. People of State of California, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959).

The Supreme Court in the Smith case was presented with four issues. Briefly, they are: (1) lack of scienter makes the statute unconstitutional; (2) constitutionally relevant evidence has been excluded; (3) unconstitutional standards were applied to the book; and (4) the book was not obscene.

The majority of the court wrote only upon the first issue. Justice Harlan, concurring in part and dissenting in part, was the only Justice to comment on the introduction of allegedly similar books. Justice Frankfurter may have by implication included introduction of this evidence in his statement concerning the use of expert witnesses.

Justice Harlan's opinion has served as the basis for subsequent confusion in

this area of the law. See Kahm v. United States, supra; Yudkin v. State of Maryland, 229 Md. 223, 182 A.2d 798 (1962). Compare In re Harris, 56 Cal.2d 879, 16 Cal.Rptr. 889, 366 P.2d 305.

The statement generally relied upon in the Harlan opinion is:

"The community cannot, where liberty of speech and press are at issue, condemn that which it generally tolerates."

Justice Harlan held that due process therefore required that a litigant have the *opportunity to introduce proof on the issue of the limits of candor set by contemporary community standards*. He recognized at the same time, however, *that it is the opportunity which satisfies due process, and he did not hold that the trier of the facts was incompetent to judge a challenge against those standards*, or that the trier of the facts was not the *embodiment* of community standards.

"Appellant attempted to compare the contents of the work with that of other allegedly similar publications which were openly published, sold and purchased, and which received wide general acceptance.

\* \* \* \* \* \*

"In my opinion this conviction is fatally defective in that the trial judge, as I read the record, turned aside *every* attempt by appellant to introduce evidence bearing on community standards." At page 172 of 361 U.S., at page 228 of 80 S.Ct., 4 L.Ed.2d 205.

Even Justice Harlan's opinion assumes proof of acceptability by the community of books sought to be introduced.

Authorities on obscenity have recently pointed out the problems involved in determining the community standards in a particular case. Lockhart and McClure, Censorship of Obscenity: The Developing Constitutional Standards, 45 Minn.Law Review 5, 112–113, sets out:

"Beyond hard-core pornography we find ourselves without a reliable guide when we look to 'community standards.' For as Judge Jerome Frank pointed out more than ten years ago, 'we do not know, with anything that approximates reliability, the "average" American public opinion on the subject of censorship.' And even if we did know enough about contemporary community standards to find a consensus on material short of hard-core pornography that the community will tolerate, we would still find ourselves in difficulty. Standards of acceptability, even when national and reasonably definite, are of dubious value in obscenity cases. In applying them, we are in the words of Zecharia Chafee saying, 'We will permit what we will permit,' which is going around in a circle 'and endangering daringly experimental works of literary and artistic distinction.' Their application also puts us in the awkward position of having to explain the presence in many libraries and museums of distinguished works of the past that offend contemporary standards—an explanation that is so hard to make that most of the time we simply look the other way in embarrassment whenever anyone calls attention to them."

Even the case of Yudkin v. State of Maryland, supra, after recognizing Justice Harlan's opinion in Smith v. People of State of California, supra, put a gloss upon Justice Harlan's statement which carries serious practical implications. That court said:

"\* \* \* in determining what is and what is not obscene, it is essential that the jury or court, *instead of being required to depend on what may well be a limited knowledge of the moral and literary standards of the community, has a right to read, or to be informed of, the contents of comparable books that have been generally accepted or tolerated by the public.*" At page 802 of 182 A.2d. (Emphasis supplied.)

These practical difficulties did not exist for Justice Harlan, in that he stressed that the trial court prevented *every* attempt to introduce such evidence. By implication, Justice Harlan would allow at least reasonable control over such an offer of evidence.

Some of the other considerations which come to this court's mind relating to this issue have not been treated in reported decisions.

For example, it may be said that the availability of certain books means no more than that other people have been violating the law and have not been caught. It may also be said that works of this nature, that is, a novel, must stand on its own feet—that is to say—no two books are exactly alike. Some of the practical problems, however, have been touched upon in the cases cited in this opinion.

The Yudkin case, supra, admitted that proper introduction of such evidence would require that the book be read by the jury. This is a practical impossibility unless the number and nature of the books for use as comparison material is reasonably circumscribed.

It is also unreasonable to require that books submitted into evidence be read by the jury in their deliberations unless the number and nature of the books for use as comparison material are reasonably encompassed.

Whether or not the remaining avenue, that is, testimony, concerning the *alleged similarity between books available in the market and the books challenged in this case*, can satisfy the requirement of an analysis of each book (see United States v. Levine, supra) is a problem for the party seeking to utilize this channel of evidence.

After a thorough study of all the cases, the briefs [23] and treatises on this issue, the court rules in this regard that the following procedure be observed:

█ If the defendants seek to establish the present limits of candor by the introduction of similar books, they may do so only by having the books and their similarity testified to by a person properly qualified.

The books themselves will not be submitted into evidence for any purpose. The defendants will be expected to satisfy the court in the following respects in utilizing this avenue of proof: (1) The defendants must convince the court that the book enjoys substantial acceptability in the community; (2) that the party testifying is qualified to compare the book introduced to those challenged; and (3) the defendants must convince the court first as a matter of law in the course of the witness' testimony that the books are substantially similar to the challenged books.

No parts of any book so sought to be introduced will be read to the jury. Any witness testifying as to their similarity may use the books to refresh his recollection as to the similarity with any challenged book.

In order that the defendants will not be under the impression that they will be allowed to introduce a great number of books until they find some which are allowed as similar by the court, the court is restricting the defendants to the use of eight books. The choice of these books will be wholly within the discretion of the defendants.

23. Defendant's brief begins by citing Manual Enterprises, Inc., et al. v. Day, 370 U.S. 478, 82 S.Ct. 1432, 8 L.Ed.2d 639, to the effect that Justice Harlan requires proof of two elements in obscenity cases: What Justice Harlan's opinion really said was this:

"In most obscenity cases, to be sure, the two elements tend to coalesce, for that which is patently offensive will also usually carry the requisite 'prurient interest' appeal. *It is only in the unusual instance where, as here, the 'prurient interest' appeal of the material is found limited to a particular class of persons that occasion arises for a truly independent inquiry into the question whether or not the material is patently offensive.*"

The burden on the defendants in that regard is no greater than where the court in its discretion limits a defendant to the use of a limited number of expert witnesses, and the defendant subsequently is informed that none of his experts qualify in the particular case.

The names of these books shall be made available to the Government a reasonable time prior to their offer, so that the Court need not take recesses during the course of the presentation of the defense for an opportunity for the Government witnesses to read these books in preparation for rebuttal, if any.

Due to the many difficult questions connected with laying the proper foundation for the introduction of such material, the court directs the defendants to file a written offer of proof on each book to be used for comparison purposes.

This ends the court's opinion as written during the trial.

In compliance with the court's order, the defendants disclosed that they intended to use the following books for comparison material:

1. Memoirs of a Woman of Pleasure—Fanny Hill, by John Cleland.
2. Tropic of Capricorn, by Henry Miller.
3. Lady Chatterly's Lover, by D. H. Lawrence.
4. Naked Lunch, by William Burroughs.
5. Carpetbaggers, by Harold Robbins.
6. Cold Wind in August, by Burton Wohl.
7. Clip Joint Cutie, by Monte Steele.
8. Sin Binge, by John Baxter.

The names of these books were disclosed to the court on November 22, 1963, immediately before the recess; the court did not reconvene in the afternoon of November 22. Defendants did not file their written offer of proof as ordered by this court until December 2, 1963, the day before defendants sought to introduce the books.

The Government made objections to the untimeliness of the written offer and to its substance. The court examined the written offer and found it to be insufficient. It consisted of little more than a conclusion that: "this book is similar; this book enjoys substantial acceptability."

Due to the persuasiveness of the objections of the Government in its brief to any comparison material, the court desired an offer of proof in order to determine whether such evidence was inadmissible on the grounds proposed by the Government. The defendants did not comply with the well-established law concerning offers of proof when they offered conclusions only, and no *evidential* facts.[24]

Instead of foreclosing the introduction of these books for comparison, on the ground that defendants failed to submit an offer of proof to preserve the contested issue, the court granted a full opportunity for the defendants to present oral testimony, out of the presence of the jury, to establish the required similarity and acceptability as the basis for a "ticket of admission" for such proffered evidence. See Womack v. United States, supra, (294 F.2d page 206), citing Wigmore on Evidence, supra.

This opportunity was granted at a time when all four of the defendants' proposed expert witnesses were present in the court room. Defendants' counsel, Mr. Fleishman, made a feeble attempt

---

24. Compare defendants' offer of proof made in regard to expert witness Galligan concerning these comparison books—*after* the inquiry (by voir dire examination) on this issue had been closed. It is to be noted that witness Galligan sat in the court room through the entire voir dire examination. Defendants' counsel failed to call Galligan at that time. That offer contained more than conclusions, but came too late.

to qualify six of the books through witness Kirsch: Memoirs of a Woman of Pleasure—Fanny Hill; Tropic of Capricorn; Lady Chatterly's Lover; Naked Lunch; Carpetbaggers; and Cold Wind in August.[25]

The court ruled that defendants had failed to show such similarity between the proposed comparison books and the challenged books so as to make the comparison books *probative* on the issue of contemporary community standards. Defendants' counsel informed the court that he had nothing further to offer on this issue before the court made its ruling.[26]

Of the two remaining books, the court had only to rule on Clip Joint Cutie; Sin Binge was withdrawn by the defendants. The court ruled that the similarity of Clip Joint Cutie was such that it did not require testimony; that the only issue was whether this book was "tolerated" by the community.

The defendants offered scant testimony on the acceptability of this book. They sought to introduce the opinion of Judge Shapiro of the New York Supreme Court, Queens County, in The People of the State of New York v. Birch, et al., 40 Misc.2d 626, 243 N.Y.S.2d 525, who had ruled that this book was not obscene. This opinion was denied admission into evidence as having too little weight and as not being a correct statement of the law.

Defendants' purpose in seeking to put Judge Shapiro's opinion before the jury paralleled the use of the Fresno case matters. (See Page 179, supra.) It was an attempt to get defendants' version of the law to the jury in printed form. The New York case involved a New York statute, and the opinion was made on a motion to dismiss the indictment.

Defendants' cavalier attempt to show toleration of this book consisted totally in the testimony of a book distributor who stated that he had received fifty unordered copies of this title; that within two to three weeks they had all been sold by the retailers he serviced in the Kalamazoo, Michigan area.

Counsel for the defendants also argued that many other books which were published by the same publisher appeared on book stands around the country. It is inconceivable that the distribution of other "Playmate" books has any bearing whatsoever on the toleration of the single book, Clip Joint Cutie.

From this evidence, it is clear that for all purposes, the community never knew this book existed, much less tolerated it. A book not tolerated by the community has no probative value in establishing contemporary community standards.[27]

25. The respective editions are as follows: G. P. Putnam's Sons, paperback; Grove Press, paperback; Grove Press, paperback; Grove Press, hardbound; Pocket Books, Inc., paperback; Dell Publishing Co., paperback.
26. Some of the testimony adduced by defendants' counsel on this issue was as follows:
"Q. (Mr. Fleishman) Have you read the book 'Fannie Hill'?
"A. (Mr. Kirsch) Yes, I have.
"Q. Is it similar to any of the books involved in this indictment?
"A. Yes, I believe in terms of subject matter and frequency of sexual activity, it is.
"Mr. Fleishman: I have nothing further on similarity, your Honor.
\*       \*       \*       \*       \*
'Q. (Mr. Fleishman) Have you read 'Naked Lunch'?

"A. Yes.
"Q. Does it deal frankly with sexual matters?
"A. Yes, it does.
"Q. Does it deal with them more frankly than the books involved in this trial?
"A. I believe it does.
"Mr. Fleishman: Nothing further.
\*       \*       \*       \*       \*
"Q. (Mr. Fleischman) Have you read 'Tropic of Capricorn'?
"A. Yes, I have.
"Q. Does it deal frankly with sexual matters?
"A. Yes, it does.
"Mr. Fleishman: I have no further questions."
27. The Government made a detailed, interesting offer of proof concerning Clip Joint Cutie. Its attorneys claimed available testimony to show: (1) that a three-day search by the employees of the largest

198

Parenthetically, the court made the observation that *Sin Binge* was similar to the challenged books, although defendants chose not to use it for comparison.

When defendants withdrew Sin Binge, they attempted to substitute the book *Rambling Maids,* which has been before the jury in the District Court case in California, earlier discussed. (See Page 179 of this opinion.) The substitution was denied by the court. This was an attempt by defendants' lawyer to circumvent the court's rulings which prohibited the naming, in the presence of the jury, of books involved in Fresno, California litigation. This was a flagrant maneuver on the part of defendants' counsel since at one time in the presence of the jury, the name of the book *Rambling Maids* "slipped" out of his mouth. It was dilatory in that it ignored the objective of the court when it ordered identification of the comparison books in time for the court to read the books before defendants offered proof on comparability.

The rationale for the court's decision on comparison books may best be found in two sources: (1) the Government's approach in its brief in the Roth case; and (2) Womack v. United States, supra.

In this case, the Government claimed that the challenged books were simple, uncomplicated, short (and defendants' witnesses agreed), and that each book spoke for itself. The court concurred with this evaluation of the challenged books. The court, however, gave defendants the opportunity to introduce in evidence eight comparable books. The defendants failed to convince the court that the books which they chose were admissible for this limited purpose. The reason for this failure can best be

seen in the view of the logic of the position of the Government in its brief in the Roth case.[28]

To briefly reiterate that position, the Government claimed that "commercial obscene material challenged under the federal obscenity statute, Section 1461" may be roughly divided into three categories.

The first category roughly referred to novels of apparent serious literary intent, sometimes skillfully written. Books in this category are caught because they concentrate on explicit discussions of sex, usually with a background of four-letter words. The Government gave as an example of this category, Henry Miller's *Tropic of Capricorn.* (See also the opinion of the court in Grove Press v. Christenberry, D.C., 175 F.Supp. 488; affirmed 2 Cir., 276 F.2d 433.) Few persons are convicted under the statutes for books in this category.

The second category roughly consists of books in the borderline entertainment area. The bulk of this category is composed of "slick" magazines, produced quite openly, containing photographs that incur the use of the statute. Also present in this category are books which contain erotic selections from other sources; when these books concentrate on explicit discussions of sex, they may be found to be obscene when taken as a whole.

Roughly, the third and largest category of material caught by the statutes is "hard-core" pornography. Sex in these productions is void of any disguise. They are sometimes clandestinely manufactured. Some of this material is in the form of photographs; some is in the form of short books or pamphlets, which

distributor of magazines and paperbacks in Los Angeles County resulted in learning only that Clip Joint Cutie was a Playtime book distributed by Neva Paperbacks, Inc., Box 2109, Las Vegas, Nevada; (2) that an eight-day search by the same parties turned up a single copy in in Los Angeles county; (3) that Clip Joint Cutie was not in print at the time of the case; (4) that the Las Vegas

address was merely a mail drop; (5) that the forwarding address in Chicago was another mail drop; (6) that two copies were obtained in Chicago by approaching customers of a distributor and (7) that a careful search in Grand Rapids stores and contact with Western Michigan distributors turned up no copies.

28. See footnote (20), supra.

consist of stories in simple, explicit words of excess sexual indulgences; normal and abnormal, over and over again. No one would suggest literary merit in these works.

This court concluded that the challenged books were either in category two or three. They had characteristics of both. Only two of the books offered for comparison were from these same categories in the court's opinion—Clip Joint Cutie and Sin Binge.

Six of the proffered books for comparison purposes were of the nature of the works described in the first category. They were, by this description, substantially different from the challenged books. The court had these guidelines in mind when it ruled on the proffered material.

The challenged material consists of small printed booklets or novelettes, most of which are stories in simple, descriptive, explicit words of sexual excesses in every conceivable form, over and over again.[29] The material is designed to exploit the erotic marketplace.

This labyrinthlike publishing business worked "openly" as follows: defendant Aday under the name of Versatile Publishing Company[30] and the fictitious name, Sunset Enterprises[31] contracted with authors for their manuscripts. If the manuscripts were accepted, they were "subleased" to either Fabian Books, Ltd.,[32] or Mid-Tower Publications[33] for the actual publication. The books were printed on common premises with these companies, or the printing was contracted. The finished book was then distributed by defendant West Coast News Company.[34]

With the exception of Sunset Enterprises, all the organizations and operations of defendants were located in one building at 2919 East Belmont Avenue, Fresno, California. Sunset was located at 2968 East Olive Street, Fresno—which could be called little more than a mail drop.

These corporations and assumed name units were formed immediately after the trial of defendant Aday in the Fresno case. A reasonable inference to be drawn from the loose, overlapping, obscure organization of these corporations is that they were created as a trap door to spring shut on the pursuit of the elements necessary for a prosecution of the type of material published.

In the words of Chief Justice Warren in Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498, Page 1513:

"They [defendants] were plainly engaged in the commercial exploitation of the morbid and shameful craving for materials with prurient effect."

This court was mindful of the categorization in the Government's brief in the Roth case, supra, when it instructed the jury. Mr. Justice Harlan in the Manual case, said in part:

"Obscenity under the federal statute thus requires proof of two distinct elements: (1) patent offensiveness; and (2) 'prurient interest' appeal. Both must conjoin be-

29. See Appendix for a summary of the books challenged in the indictment.

30. Exhibit 40 is a certificate showing Aday operating a sole proprietorship under the fictitious name, Versatile Publishing Company.

31. Testimony of witness Lindsay, co-editor to Aday, was that Aday controlled Sunset Enterprises. No documents were introduced.

32. Exhibit 24, 24a, Articles of Incorporation of Fabian Books, Ltd., shows defendant Aday as director, secretary-treasurer, sole shareholder. Defendant Maxey was

a director and president. Incorporated February 16, 1959.

33. Exhibit 25, 25a, Articles of Incorporation of Mid-Tower Publishing shows defendant Aday as sole shareholder, secretary-treasurer and director. Defendant Maxey was a director and president. All Saber books were published by Mid-Tower. Incorporated June 26, 1959.

34. Exhibit 20, 20(a), Articles of Incorporation of West Coast News Company, shows defendant Aday as director, secretary-treasurer, sole shareholder; defendant Maxey as director. Incorporated February 16, 1959.

fore challenged material can be found 'obscene' under § 1461." Manual Enterprises v. Day, 370 U.S. 478, 82 S.Ct. 1432, 8 L.Ed.2d 639, at Page 646.

This court believes there is a substantial difference between Roth and Manual. The Roth test is sufficient in certain obscenity cases without the additional requirement of Mr. Justice Harlan's above quoted language. However, this court agreed with the opinion that each book of the challenged material spoke for itself, and, thus, showed whether it was obscene or not. A jury *could* determine that issue without reference to other material or expert witnesses.

Consistent with this conclusion, this court instructed the jury as follows:

"The total concept under the words stated in the statute as it relates to the facts in this case, requires that before you find any book is obscene, you must find that each book is patently offensive and that it appeals to the prurient interest.

"Both of these elements must conjoin before challenged material can be found obscene under the federal statute."

This instruction works to the advantage of the defendants, and was an additional protection to their constitutional rights.

■ One need only repeat the statement of the court in Womack v. United States, supra, to demonstrate the other reason behind the court's denial of defendants' proffered comparative material.

"The predicate for a conclusion that a disputed piece of mailed matter is acceptable under contemporary community standards, as shown by proffered other matter already in unquestioned circulation, must be that the two types of matter are similar. And as another part of his foundation he must show a reasonable degree of community acceptance of works like his own." At page 206 of 294 F.2d.

The defendants failed to supply this predicate.

The problem of comparison material is further confounded in this case, as Judge Prettyman pointed out: (Womack v. United States, supra).

"Most of the difficulty which enshrouds discussion of the law concerning obscenity and filth develops upon consideration of books and magazine articles. Here arise problems of *scienter, the meaning and effect of the whole,* the value of the work to proper interests of the public, the contemporary community standards in similar matters, and other baffling problems * * *. But we have no such problem in the case at bar. These are stark, unretouched photographs * * *." At Pages 205–206 of 294 F.2d. (Emphasis supplied.)

It is one thing to compare pictures; quite another to compare books.

Under the Roth test, a book must be judged by its dominant theme, taken as a whole. Similar books, in order to be probative as to customary limits of candor, must then be judged also by their dominant theme. The book as a whole must be comparable to the challenged books, not just isolated passages. To hold otherwise, as the defendants sought in qualifying the proffered books in this case, would be to apply the *Hicklin-isolated passages test* to the proffered books, while asking the jury to apply the *Roth-book as a whole test* to the challenged books. Defendants' position is clearly untenable.

It was this very distinction which played a large part in the court's decision to limit the number of comparable books to be offered by defendants to eight.

Defendants would measure contemporary community standards by the flood of material allegedly similar to the challenged material.

In considering whether or not the community tolerates this flood we cannot dis-

regard the fact that there is a consensus of "we the people" as expressed in the universal judgment that obscenity should be restrained. As stated by Justice Brennan, writing for the majority in Roth, supra:

" * * * the universal judgment that obscenity should be restrained [is], reflected in the international agreement of over 50 nations, in the obscenity laws of all the 48 States, and in the 20 obscenity laws enacted by the Congress from 1842 to 1956. This is the same judgment expressed by this Court in Chaplinsky v. New Hampshire [315 U.S. 568, 571–572, 62 S.Ct. 766, 769, 86 L.Ed. 1031] * * * :

" ' * * * There are certain well defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. *These include the lewd and obscene * *. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to the truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality * * * .'*

"We hold that obscenity is not within the area of constitutionally protected speech or press." At page 485 of 354 U.S., at page 1309 of 77 S.Ct., 1 L.Ed.2d 1498.

Evidence of the very flood of material which defendants sought to place before the jury emphasizes the social problem created by wide-spread distribution of that kind of material.[35] The tools available are inadequate to arrest this flood. The public, therefore, is effectively denied the choice which toleration implies.

The patient endurance of a long-suffering, and all too often frustrated people, must not be confused with an alleged toleration of the torrents of commercialized material purposely published with an appeal to prurient interest and to an exploitation of the erotic marketplace.

Community standards must be the means by which well-ordered justice and liberty are maintained; otherwise, they cease to be standards and become, instead, instruments of tyranny—that by which men and civilizations decay.

## 6. SUFFICIENCY OF THE EVIDENCE.

The motions raised the question of sufficiency of the evidence to support the conviction of the defendants. There was sufficient and abundant evidence to present the case to the jury.

In support of the positions stated in this opinion, the court includes an appendix containing a summary of the eight challenged books.

This opinion does not embody all the rulings which the court made during and after the trial, but it treats only those set out on Page 174, supra.

Defendants' post-trial motions are separately and severally denied.

### APPENDIX

DESPERATE MOMENTS:

Moved by the syndicate's murder of her husband, the main character, herself maimed, changes her name and sets out to revenge her husband's death. Her method of operation is to have sexual intercourse with the members of the syndicate, working her way to the murderer.

After lively competition with the girls already used by the syndicate, the heroine succeeds in killing the leader, her husband's murderer.

---

35. The defendants introduced, and the court accepted for purposes of making a record, boxes containing hundreds of paperback books and magazines; defendants claim that these are proper evidence of contemporary community standards. In order for them to be useful to the jury, under the required test, the jury would still be reading.

Among the numerous sexual activities in the book one finds: exhibition for a photographer of nudes, in many postures; mass intercourse lasting some five hours with the syndicate members— to "qualify" her; sexual intercourse with a crippled twisted gnome in order to earn information; extremely sadistic sexual intercourse in a pool of blood drawn by the knives of the participants.

The physical organs are referred to at will and are distorted. The characters have little dimension and are unrealistically portrayed. 154 pages.

## LOVE PRINCESS:

A young girl with wild extraordinary sexual cravings moves from man to man to satisfy her lust. She is raped by her stepfather, rapes a truck driver in a garbage filled alley, seduces her boss, her boyfriend, and a bus driver, enjoying extended intercourse with all of them.

This nymph is generously endowed physically, her partners being graphically described. The book includes frequent allusion to the private parts. Passion, sadism, and masochism are emphasized. 140 pages.

## I AM A LESBIAN:

Two girls find they have strong attraction for each other, vow eternal love and share lesbian love making. The jealous boy next door, angry at their antics, rapes one of the girls; she becomes pregnant, the baby is born dead. The victim is befriended by an older man.

Repeated unhappiness in her normal relationships leads the main character to return to lesbianism. The author repeatedly shows marital sex as inferior to lesbian sex in pleasure, intensively describing the acts between the girls. 119 pages.

## DECISIVE YEARS:

This is the story of a twelve year old girl and her sexual experiences. She is tutored by a thirteen year old, and initiated by her dead mother's last lover. She goes to live with an older man and there meets his girl friend who maneuvers the heroine into lesbian love making. She continues her lesbian affairs with another woman, and is finally "cured" by rape and a beating by the man she is living with.

The genitals are described generally consistent with the age of the participants; they are most intimately and insistently referred to in most episodes. Brutality plays its part in the acts of sex. While two years are once compressed into two pages, a single sex episode takes many more pages. 151 pages.

## BLACK NIGHT:

An average housewife loses her husband to amnesia and pimping, joins a brothel in an attempt to recover him. We become acquainted with the various members of the house, and see the housewife and her husband reunited, unknown to him. The wife finally confronts her husband with the girl he favors during his periods of amnesia; after trying her, the husband decides to return to his wife.

The genitals are only moderately emphasized; sadism is stressed in at least one episode. While the book span is six or seven months, the one night brothel scene occupies 60 of the 126 total pages.

## WITCH FINDER:

A widow with two children is forced into fellatio by the town Romeo; by a tape recording trick he spreads the word that she desires to repeat this upon all comers. Time after time, she is forced to repeat the act until the town women learn of it and plan to tar and feather her. She is finally ridden naked through the area on a pole covered with sharp splinters. The widow is rescued by members of the local whore house who persuade her to make her acts a house specialty. After a byplay between Rod and a woman who wants only to participate in cunnilingus, Rod obliging, and a detailed reference to the joys of oral sexual pleasures, the book ends with an observation by the local preacher.

The stress is on the mouth as a genital organ. Sadistic torture appears. 141 pages.

NEVER ENOUGH:

The main character begins his story by leaving the navy, in Norfolk, meeting a prostitute in a bar, having sexual intercourse with her, and being rolled. In a quite unrelated fashion, he then becomes a used car salesman, and we learn that no woman has ever satisfied him.

The story is then a series of episodes between the main character and willing women. After much intercourse, unsuccessful seduction, bizarre flashbacks, and a nymphomaniac from nowhere, the sexual craving of our character finally leads him to a young girl with whom he is satisfied.

The sexual equipment of the characters is grossly emphasized. The sex acts all culminate in wild pleasure. Sadism and maschism are featured. Characters leave and enter the story with no apparent relationship with the story. 142 pages.

SEX LIFE OF A COP:

The story essentially follows the activities of two policemen as they patrol the streets of a town. Each encounter with a female leads to mutually desired intercourse—in fact the women seem to be the aggressors. Two married girlfriends, a drunk woman found on the street, a waitress, the female police dispatcher, the mayor's wife, each other's wives, a female news reporter, two nurses, a woman reporting a prowler, a woman with "heater trouble", the madam of a brothel, all join in sexual intercourse with the policemen.

In addition, sex is introduced by reference throughout the book. Lover's Lane and parked cars yield confrontation of people in varying states of undress and activity.

The genitals are repeatedly referred to, being oversized. The book is written in graphic, vivid, sexual language. All the accomplishments of the two main characters happen in a time span of two weeks. One week is explained by one sentence; one episode of intercourse takes four pages. The official acts of the policemen are conspiciously few. 142 pages.